[No. A120628. First Dist., Div. Two. Apr. 2, 2009.]

THE PEOPLE, Plaintiff and Appellant, v.
WILLIAM RUSSELL DAWSON, Defendant and Respondent.

COUNSEL

Stephan R. Passalacqua, District Attorney, William S. Mount, David S. Barkhurst and Eric R. Strong, Deputy District Attorneys, for Plaintiff and Appellant.

Eric Multhaup for Defendant and Respondent.

OPINION

**RICHMAN, J.**—We see, yet again, the tragic consequences that can result from the mixture of boating and alcohol—here, the death of Mark Spier.

Defendant William Russell Dawson was charged with five crimes, two of which were felonies: vessel manslaughter while intoxicated and unlawful operation of a vessel while intoxicated resulting in bodily injury. The charges stemmed from the death of Spier who, himself very intoxicated, jumped off the back of a boat as defendant put the boat in reverse, struck the propeller and died instantly. Following a preliminary hearing, the magistrate declined to hold defendant on the felony charges, finding that he did not cause Spier's death: "What caused the death of this individual was the jumping off while the boat was in reverse." The superior court declined to reinstate the charges, concluding it was bound by the magistrate's factual finding that defendant did not cause Spier's death.

The People appeal, essentially arguing that the magistrate misapplied the law of causation. We agree and we reverse.

## I.  BACKGROUND

By complaint filed May 24, 2007, defendant was charged with five offenses: (1) vessel manslaughter while intoxicated (Pen. Code, § 192.5, subd. (b); a felony); (2) unlawful operation of a vessel while intoxicated resulting in bodily injury (Harb. & Nav. Code, § 655, subd. (f); a felony); (3) unlawful operation of a vessel while under the influence of alcohol (Harb. & Nav. Code, § 655, subd. (b); a misdemeanor); (4) unlawful operation of a vessel with 0.08 percent or more blood-alcohol content (Harb. & Nav. Code, § 655, subd. (c); a misdemeanor); and (5) unlawful use of a vessel in a reckless or negligent manner, placing life or limb of another at risk (Harb. & Nav. Code, § 655, subd. (a); a misdemeanor).[1] The complaint also alleged in aggravation that defendant had a prior conviction for driving under the influence of alcohol in violation of Vehicle Code section 23152, subdivision (b).

*The Preliminary Hearing*

At a preliminary hearing on the felony charges, the prosecutor offered the testimony of three witnesses: Sonoma County Deputy Sheriff Daniel

---

[1] The misdemeanors are not involved in this appeal.

Peccorini, the officer who responded to the accident, and Jessica Spaletta and Melissa Daniels, two of the people on the boat at the time of the accident. They testified as follows:

Deputy Peccorini was assigned to the sheriff department's marine unit. At approximately 3:45 p.m. on May 6, 2007, he received a call to respond to the Warm Springs arm of Lake Sonoma. When he arrived, he saw many boats surrounding a boat, with people in the water attempting to remove a body from the propeller area of the boat. The body was that of Spier.

There were six people on the surrounded boat, subsequently identified as defendant, Spaletta, Daniels, Wendy Ray (Spier's girlfriend), Eric (Ray's son), and Tyler Martino. In response to Peccorini's question, defendant identified himself as the owner of the boat. Peccorini then asked who was operating the boat at the time of the accident. Nobody responded, so he asked a second time, looking particularly at defendant; defendant said, "I don't know who was operating the boat." Peccorini repeated his question a third time; again, nobody responded.[2] Peccorini told the group that until he determined who was driving the boat, he was going to treat them all as the operator. Spaletta then spoke up, stating that she was not going to "go down" for something she did not do, and whoever was driving needed to "fess up." Defendant then acknowledged he was driving the boat at the time of the accident.

Peccorini testified he asked defendant how the accident occurred, and he "told me that Mr. Spier had been on the back swim step of the boat preparing to ski. They were drifting towards the shore. He instructed Mr. Spier to get back in the boat because he needed to reposition the boat. At the time that he began reversing the boat Mr. Spier jumped into the lake." Defendant told Peccorini that the rope and ski had been put in the water. As defendant was describing what happened, Peccorini detected an odor of alcohol coming from defendant, whose eyes were red and watery and whose speech was slurred.

Peccorini then asked Tyler Martino what happened, and "He said that Mr. Spier was at the back swim step preparing to ski. The rope and the ski were in the water. They began telling Mr. Spier to get back in the boat, that they needed to reposition the boat. When the boat began reversing Mr. Spier went into the water."

---

[2] At another point, Peccorini testified that defendant twice told him he did not know who was driving the boat.

Peccorini identified the wooden platform on the rear of the boat as a swim platform or ski step, which he indicated is an extension of the transom on the boat. On the ski step, there is a sticker that says, "Danger. Keep away from rear of boat while running to avoid personal injury." Peccorini identified two dangers of having someone on the ski step while the motor is running: the risk that the exhaust fumes can overtake someone without their realizing it; and the risk of falling off the back of the boat and being struck by the propeller. There was also a warning sticker by the throttle that said, "Danger. Avoid serious injury, shut off and/or do not start engine before allowing anyone on or about swim platform." Peccorini said that when he is patrolling the lake, it is not uncommon to see people riding on the transom area of boats, and he issues tickets to boat operators for this "[a]ll the time."

After returning to shore with defendant, Peccorini performed a variety of field sobriety tests, on which defendant performed poorly. Peccorini also tested defendant's blood-alcohol content, which registered 0.14. In light of these evaluations, Peccorini concluded defendant was operating his boat under the influence of alcohol.

Peccorini also examined the boat and found numerous bottles of beer and hard liquor. He asked Spaletta and Daniels about their alcohol consumption, and both said they had consumed one half of a beer, if that. Peccorini interviewed all of the witnesses except Wendy Ray, and none of them indicated that there was a lookout on the boat.

Jessica Spaletta testified that on the day in question she and Daniels boarded defendant's boat on Lake Sonoma around 1:00 p.m. She had met defendant earlier through a former roommate, and had hung out with him a few times; she did not consider him a good friend. When she and Daniels got on the boat, a number of people were already on board, including Spier, whom she had never met, and who, it was clear, was already "beyond intoxicated." Over the next few hours, Spier continued to drink "quite a bit," like one beer after another.

Many times throughout the afternoon the boat drifted toward the shore and had to be repositioned. During these maneuvers, Spier was reluctant to comply with the requests to sit down, repeatedly complaining he wanted to water ski. About 10 or 15 minutes before the accident, Spier got in the water to ski, stashing a beer or two in his life vest before entering. He was unable to get the ski on, however, and climbed back into the boat. Everyone was encouraging Spier to skip the waterskiing for the day because he was

obviously too intoxicated. But Spier insisted, getting more and more agitated or angry that the waterskiing was not working out: "He wouldn't listen to anybody; it was more like he wanted to do what he wanted to do."

Just before the accident, Martino, who had been piloting the boat all afternoon, got out of his seat. The seat was empty for "a little bit," but about a minute or less before the accident happened, defendant sat down in the driver's seat. Somewhere around this time, there was a bunch of "hollering" as people were telling Spier to stay in the boat, sit down, and relax; instead he was "[g]etting impatient and wanting to jump off the boat." Defendant then started to back the boat up, very slowly and smoothly. Out of the blue, Spier suddenly said, "Fuck it," and jumped in. The accident happened very quickly: "He jumped in and he was dead."

Asked by the prosecutor specifically about Spier's location on the boat leading up to the accident, Spaletta could not say where he was on the boat two minutes prior. She testified, however, that immediately before he was struck by the propeller, he was on the wooden platform, although she could not remember if he was sitting or standing. While he was on the wooden platform, there was "some hollering," and while she knew it was Spier hollering, she did not know exactly what the "hollering" was about, other than people telling Spier to sit down and relax. She believed that while Spier was hollering and before he went into the water, there was a ski rope in the water, although she could not remember how long it had been there.

On cross-examination, defense counsel asked Spaletta about Spier's location when defendant began to reverse the boat: "Do you remember if [Spier] was sitting up on this padded area with Wendy [Ray] when the boat started to back up?" Spaletta responded, "Yes I believe so, that he was." She also remembered hearing an announcement for everyone to stay put because the boat was going to be backed up.

Melissa Daniels testified that she and Spaletta got on defendant's boat in the afternoon, at which time there were already other people on the boat, none of whom she knew. It was apparent that Spier and his girlfriend had been drinking.

Martino was driving the boat the entire afternoon, and as the afternoon went on, Spier was paying less attention to directions and getting more difficult to deal with. At some point, Spier was getting ready to water ski, and people on the boat were telling him that he had to put on a life vest, which he

eventually did, storing additional alcohol in the vest before entering the water. Spier was unable to get the ski on because he was, according to others' comments, too intoxicated, so he returned to the boat.

About 10 to 20 minutes after Spier's failed attempt at waterskiing, there was a discussion about having to move the boat away from the shore. During that time, Spier continued to insist on waterskiing, while others were trying to reason with him, to convince him it was not a good idea. They were trying to calm Spier down and get him to stay in the boat, but he was not cooperating, ignoring everybody's pleas and insisting that he was going to water ski. Daniels believed that during this period of time, Spier was sitting down, and at some point before the accident was seated on the padded area above the wooden platform. She testified, however, that immediately prior to the accident he was on the wooden ski step, estimating first that he was there for "a couple of minutes," and then for "about 15 minutes" before entering the water. Daniels saw him enter the water and was surprised when he jumped in.

In describing the motion of the boat at the time of the accident, Daniels testified that it was idling and staying in one place at the time Spier entered the water. And when defendant backed the boat up, it was smooth and very slow. Asked to clarify whether the boat was idling or backing up when Spier was struck, Daniels testified that "[i]t seemed like the waves were pushing the boat backwards slowly." She did not know if the boat was in gear at that point. It was quiet and was moving slowly in the water when Spier jumped in.

Following the conclusion of the prosecution's evidence, the parties offered two stipulations. The first was that a 6:00 p.m. blood draw confirmed that defendant's blood-alcohol content was 0.10. The second was that when Spier died, he had a blood-alcohol content of 0.22 and also had methamphetamine and diazepam in his system.

The magistrate then invited argument, expressing particular interest on the question whether "defendant's negligent conduct caused the death of another person" and the issue of proximate cause. The prosecutor argued that defendant was operating the boat with somebody on the ski step "which started the events in sequence that eventually led to Mr. Spier's death." The magistrate then posed the following hypothetical: "[W]hat if [an intoxicated] person is sitting in the cockpit . . . and they slid when the boat is put into reverse, run to the back of the boat, jump off the transom and into the water and have the same result. How if at all is that different from someone who is standing on the transom when the negligence itself of having somebody on

the transom has to [lead] to the death?" The prosecutor responded that "[s]omeone running from the cockpit down the length of the boat and jumping overboard as the boat is reversing, and that person being struck by the propeller would arguably not be a natural and foreseeable consequence of backing up the boat." In such a situation, the prosecutor acknowledged, the individual would be the sole cause of his or her own death. But in this case, Spier was on the ski step when defendant reversed the boat.

Counsel for defendant disputed the prosecutor's claim that Spier was on the ski step when defendant began reversing. Instead, counsel claimed the testimony showed that Spier was on the "padded portion" of the boat: "[h]e was up, he was down." Turning to the issue of causation, defense counsel noted that defendant's negligent conduct "has to be the direct cause," and argued that what happened here was not foreseeable: "It's not foreseeable in this case that you back a boat up, and by all by [*sic*] the witnesses from the prosecution in a safe manner where it was going very slowly, there was nothing jerky, it was smooth, that Mr. Spiers [*sic*], who is somewhere around the transom area, decides that he's just going to jump in at the back of the boat when it's backing up."

A few pages later the court asked defendant's counsel, "[W]as it foreseeable and a cause of this death that Mr. Spier was on the back of the boat and intoxicated, positioned in a place where he shouldn't have been where the boat is operating and ostensibly Mr. Dawson put the boat into reverse when he was in a place where he shouldn't have been, that is where Mr. Spier is in a place that he shouldn't have been?" Counsel for defendant responded, in part contending that Spier "jumped in on his own volition. He just decided, I'm out of here and I'm jumping in. And he could have been anywhere on that boat to do that. And I think it begs it when—well he was back in the transom. He's back in that area. There's no indication that that's—being in that position maybe albeit maybe it was a violation I'm not saying that it was, but say for argument sake that that's a technical violation. There's no evidence. There's nothing to support that that violation is what caused his death. He had to literally take himself and jump, and throw himself off the boat. He jumped off. He didn't slip. And . . . that is not foreseeable that somebody would decide. [¶] And what he said, it was clear what his intentions were. He was impatient. He was tired of waiting. He said, quote, 'fuck it' and he jumped off the boat literally, obviously showing that that's what he wanted to do on his own volition. His own volitional movement is what caused his death, not where he was at in the boat, not how the boat was being operated because everyone testified it was going very slowly and backing up smoothly in a very slow fashion."

The prosecutor briefly responded, followed by an even briefer comment by defendant's counsel, after which the People submitted the matter. The court then asked defendant's counsel, "[I]f you were to put on evidence, do you intend to call witnesses at this hearing if the ball is placed in your court, and if so what is your proffer of what they would say?" Counsel made a lengthy offer of proof as to what Martino would say, following which the court said, "All right. At this time you may call your witness." And Martino took the stand on behalf of defendant.

Tyler Martino, who had known defendant for a long time, testified that they got to Lake Sonoma shortly after 1:00 p.m., and picked up Spaletta and Daniels a little while later. Martino was driving the boat when they picked them up, and in fact drove the boat the vast majority of the afternoon because he elected to be the designated driver while everyone else enjoyed a few drinks (though acknowledging that he consumed "[m]aybe three beers" over the course of several hours). The only time Martino was not driving was when the accident occurred, some two to two and a half hours after they had been out on the lake.

In the hours before the accident, they were on the boat listening to music and eating. Numerous times the boat drifted too close to shore, and Martino had to reposition it. When he did, he would issue a "general call" to everybody to get in the boat because it had to be moved. Everyone willingly complied with his instructions except for Spier, who did so only begrudgingly, as he seemed reluctant to follow instructions from somebody younger than himself. As the afternoon wore on, Spier became "pretty intoxicated," and was getting more difficult to deal with.

At a certain point, Spier wanted to go waterskiing. He got in the water but was unable to get the ski on, so he returned to the boat, and the ski and rope were brought back in as well. Martino went to search the boat for a bigger flag because the one they had been using when Spier was in the water was small, specifically acknowledging that the reason for the bigger flag was because Spier wanted "to go into the water and ski." As Martino was searching, he noticed that the boat was drifting too close to shore and wanted somebody to back it away while he continued his search for the flag. Defendant became that operator. Martino directed everybody to stay in the boat, and everybody acknowledged his request, although Spier did so "stubbornly." At that time, Spier was sitting on the padded engine cover with his feet on the seat towards the driver.

Martino then described what happened next: "[R]ight after [defendant] started the boat and started to reverse it, I went back down looking for a flag. And I looked up. I—well, I heard a big clink, so I looked up and did a quick head count and noticed somebody was overboard, so I told [defendant] to shut off the engine and I jumped over the boat." Defendant had backed up the boat very smoothly because Martino was standing up and did not need to hold onto anything.

Under cross-examination by the prosecution, Martino denied that Spier was on the ski step immediately before the accident, reiterating that he was on the padded engine cover 15 seconds before he went into the water. Martino also denied that he told Deputy Peccorini that Spier was on the ski step.

In rebuttal, the prosecution recalled Deputy Peccorini, who reiterated that Martino told him Spier was on the ski step immediately before going into the water and that he jumped from the ski step to the area behind the boat.

*The Magistrate's Decision*

Immediately following that rebuttal, the magistrate declined to hold defendant over on the felony charges. Because the magistrate's determinations are at the heart of the parties' positions, we quote his decision in its entirety: "The court is not going to hold Mr. Dawson to answer for the felony charges here. The place where the court wants to make its record as clearly as I can for all purposes, so everybody has an understanding of it is that I agree that there was negligent conduct here. I certainly hold no breach for the operation of any boat in the water that that kind of machinery involved for somebody who is perhaps as much as a 0.14 at the time, given the court's understanding of the depletion of alcohol with blood alcohol over time. However, where I draw the line in this case is that the negligent conduct and acts of the defendant do not in this court's view amount to what caused the death of another person. They are not what caused Mr. Spier's death. [¶] And again, not with reference to contributory negligence, but it has to be Mr. Dawson's negligence that actually caused the death. And while a person shouldn't be allowed to stand on the back step, and accepting the People's evidence in its most sanguine light from their perspective, it didn't. That's not what caused the death of this individual. What caused the death of this individual was the jumping off while the boat was in reverse. There was nothing apparently wrong with the way the boat was put in reverse when the boat was moving. [¶] The evidence that was presented about the belligerent attitude or the uncooperativeness of the victim in this case has some impact on the court, but Mr. Martino's testimony that—and I think it comports with others' testimony—that he was directed, that is Mr. Spier was directed to do certain things for his own safety, ostensibly did those things when the boat

was being backed up and in the organic situation of that boat moving backwards he nonetheless chose to take matters into his own hands, could not then devolve back to the defendant in this case. [¶] Yes, Mr. Spier's presence on the stern area or transom area of the boat put him in closer proximity to danger, but it was not the defendant's negligence per se that made that danger a push over into the area where he became the actual cause of the defendant's death or his negligence became the actual cause of the defendant's death. So Mr. Dawson based on this court's ruling will be discharged as to the felony charges in this matter, Counts I and II." In sum, the magistrate dismissed the charges because defendant was not the cause of Spier's death.[3]

### The Motion for Reinstatement

On October 23, 2007, the prosecutor moved for reinstatement of the felony charges pursuant to Penal Code section 871.5. The motion argued that: "[T]he magistrate erred as a matter of law in ruling the victim's act of jumping into the water from Defendant's boat constituted a superseding act, breaking the causal chain and absolving Defendant of criminal liability. This is so for two reasons: The decedent's act was foreseeable; and so were the ensuing injuries. Moreover, because the magistrate dismissed the felony charges without making factual findings, the ruling was erroneous as a matter of law because the record provides a rational basis for believing Defendant guilty of the charged crime."

---

[3] The charged felonies were violations of Penal Code section 192.5, subdivision (b) and Harbors and Navigation Code section 655, subdivision (f). The former reads as follows: "Vehicular manslaughter pursuant to subdivision (b) of Section 191.5 and subdivision (c) of Section 192 is the unlawful killing of a human being without malice aforethought, and includes: [¶] . . . [¶] (b) Operating a vessel in violation of subdivision (b), (c), (d), (e), or (f) of Section 655 of the Harbors and Navigation Code, and in the commission of an unlawful act, not amounting to felony, but without gross negligence; or operating a vessel in violation of subdivision (b), (c), (d), (e), or (f) of Section 655 of the Harbors and Navigation Code, and in the commission of a lawful act that might produce death, in an unlawful manner, but without gross negligence." (Pen. Code, § 192.5, subd. (b).)

The latter provides: "(f) No person shall operate any vessel . . . while under the influence of an alcoholic beverage, any drug, or under the combined influence of an alcoholic beverage and any drug, and while so operating, do any act forbidden by law, or neglect any duty imposed by law in the use of the vessel . . . which act or neglect proximately causes bodily injury to any person other than himself or herself." (Harb. & Nav. Code, § 655, subd. (f).)

While noting that the offenses were not identical, the magistrate looked to CALCRIM No. 591, the jury instruction applicable to vehicular manslaughter while intoxicated, for guidance as to the elements defining the felonies with which defendant was charged. As is pertinent here, CALCRM No. 591 requires that "defendant's negligent conduct caused the death of another person." (See also LaFave, Criminal Law (4th ed. 2003) § 6.4(g), p. 349 [for crimes requiring proof of negligence by defendant, it must be established that the negligent conduct caused the prohibited result].)

Defendant's opposition argued that the magistrate's causation determination was a finding of fact, not a conclusion of law, and thus bound the superior court because it was supported by substantial evidence.

On January 16, 2008, the superior court heard argument on the motion, during which the court and the prosecutor engaged in the following exchange:

"THE COURT: [T]he magistrate held that the victim's being on the ski step was not a cause of the accident. It's not a question of—in other words, not a substantial cause of the accident, and there's simply no causative relationship between that set of facts and the ultimate death. Then his decision is correct. And the question is, isn't that a factual determination?

"THE PROSECUTOR: I think that the magistrate erred in failing to look at the law as presented. And what I'm talking about is the language in [*People v.*] *Brady* [(2005) 129 Cal.App.4th 1314 [29 Cal.Rptr.3d 286]] that, if the defendant was negligent and the negligence was a substantial factor in bringing about the injuries but the immediate cause of the injury was the misconduct of the victim, the defendant is not liable for those injuries if the kind of conduct resulting from the conduct of the victim is the kind of conduct that would have been reasonably considered.

"THE COURT: See, the key words there that you used are that the negligence was a cause of the harm. A cause. Okay? And what I read [the magistrate's] decision to be is that the negligence here was not a cause of the harm. There's no causative relationship at all. Not a proximate cause, but no cause at all.

"THE PROSECUTOR: Which is a finding of law, not of fact. A finding of proximate cause is one of law.

"THE COURT: It's usually a question of fact for the jury. If the facts are not in question, there can be no doubt, then it can be a determination of law by the Court, but ordinarily the causation determinations are questions of fact for the jury.

"THE PROSECUTOR: Whether or not the court applies the facts that are found correctly to the law, however, is reviewable by this Court, and our position is that [the magistrate] did not make a finding of fact, but misapplied the law and therefore made a legal finding that was inapplicable."

After further argument, the superior court agreed with defendant's counsel that the magistrate's determination that defendant did not cause Spier's death was a finding of fact and denied the motion, explaining: "[T]he finding of fact

here was based on the witnesses' testimony as to the conduct of the defendant earlier in the day, and I think that that was within the realm of reason for the judge to reach that conclusion. Whether other judges would reach the same conclusion, I'm not going to speculate, but I'm just saying that I think that was a finding of fact that I'm not able to overturn in this motion. And on that basis I will deny the motion."

The People then filed a timely appeal from the order denying the motion to reinstate the felony charges.

## II. DISCUSSION

### A. *The Magistrate's Role at the Preliminary Hearing, and the Court's Thereafter*

A magistrate's function at a felony preliminary hearing is to determine whether or not there is "sufficient cause" to believe defendant guilty of the charged offense. (Pen. Code, §§ 871, 872.) The term "sufficient cause" means " 'reasonable and probable cause' " or "a state of facts as would lead a [person] of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666–667 [108 Cal.Rptr. 657, 511 P.2d 609]; see also *People v. Slaughter* (1984) 35 Cal.3d 629, 636 [200 Cal.Rptr. 448, 677 P.2d 854] (*Slaughter*).) In performing this function, the magistrate may "weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses." (*People v. Uhlemann, supra,* 9 Cal.3d at p. 667; accord, *Jones v. Superior* Court (1971) 4 Cal.3d 660, 667 [94 Cal.Rptr. 289, 483 P.2d 1241] (*Jones*).) "A charge will not be dismissed for lack of probable cause 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " (*People v. Superior Court (Day)* (1985) 174 Cal.App.3d 1008, 1020 [220 Cal.Rptr. 330].)

When an action has been dismissed by the magistrate, Penal Code section 871.5 allows the prosecution to seek review in the superior court and request reinstatement of the charges "under the same terms and conditions as when the defendant last appeared before the magistrate." (Pen. Code, § 871.5, subd. (a).) However, the prosecution may only seek reinstatement on the basis that "as a matter of law, the magistrate erroneously dismissed the action or a portion thereof." (Pen. Code, § 871.5, subd. (b).) "If the magistrate made express factual findings and dismissed the charges for lack of probable cause, the superior court is bound by those findings if supported by substantial evidence. If the magistrate dismissed the charges without making factual findings, the superior court reviews the dismissal as a question of law." (*People v. Childs* (1991) 226 Cal.App.3d 1397, 1406 [277 Cal.Rptr. 456]; see

also *Slaughter, supra*, 35 Cal.3d at pp. 638–642; *People v. Fay* (1986) 184 Cal.App.3d 882, 890 [229 Cal.Rptr. 291].) "The magistrate's order is reviewed to determine whether as a matter of law the evidentiary record discloses a rational basis for believing the defendant guilty of the charged offense." (*People v. Childs, supra*, at pp. 1406–1407; see also *Slaughter, supra*, 35 Cal.3d at pp. 638–642.) And on appeal following a superior court order denying a motion to reinstate, we disregard the superior court's ruling and examine only the magistrate's ruling. (*People v. Massey* (2000) 79 Cal.App.4th 204, 210 [93 Cal.Rptr.2d 890].)

### B. *The Parties' Positions on the Magistrate's Decision*

The parties devote several pages arguing about the standard of review, an argument that stems from a fundamental disagreement about what they claim the magistrate "found." Specifically:

The People's brief early on asserts that "[a]s will appear, the People have no quarrel with the factual findings made and relied upon by the magistrate; indeed, our case for going forward with proceedings rests on those same facts. What the People contend is that the magistrate—and the superior court in his wake—overstepped the *legal* boundaries that define their respective jurisdictions; the first in the case of a preliminary hearing; the second in assessing and ruling on a motion for reinstatement. [¶] Moreover, in reaching his ruling, the magistrate brought to the facts as he found them (and with which the People have no quarrel) an unarticulated legal standard of causation that, in his view, amounted to an 'acquittal' of defendant of the negligent homicide charge: He reasoned that because the victim leapt into the water as the boat was being maneuvered by defendant, he was himself the 'cause' of his own death when his head struck the spinning propeller. This conclusion amounted to plain legal error. Put another way, given the facts as found by the magistrate, probable cause existed—applying the correct causation standard—for a reasonable person to conclude a crime had been committed and defendant had committed it." In short, the People's position is that the magistrate "found" that Spier was on the ski step.

Defendant's position is 180 degrees contrary. In his words: "the factual predicate of the trial court's ruling was that Spier was *not* on the ski step at the time the boat began backing up, but was rather sitting on the padded engine cover area where he was supposed to sit, in 'ostensible' compliance with the safety measures that defendant, Martino, and the others insisted on. The court clearly *rejected* the prosecution's scenario that Spier was *standing* on the ski step at the time the defendant began backing up the boat. The trial court's clear resolution of the somewhat conflicting and ambiguous factual testimony is the predicate that compels the legal conclusion of the superseding independent cause." Or, as defendant puts it a few pages later: "The

magistrate clearly rejected the fragments of testimony that suggested Spier was standing or sitting on the ski deck or ski step at the time that defendant began backing the boat up. The magistrate clearly accepted the testimony that Martino and others insisted that Spier sit on the padded cover right behind the driver's chair where the passengers were supposed to sit. The magistrate clearly accepted Martino's testimony that when defendant began backing the boat up Spier was in fact sitting on the engine cover 'for his own safety.' The magistrate clearly accepted Martino's testimony that only after defendant began backing the boat up in a safe and cautious manner did Spier 'cho[o]se to take matters in his own hands.' [Citation.] [¶] The People cannot legitimately challenge the ruling below by insisting upon a factual scenario that was clearly rejected by the magistrate in his resolution of ambiguous and conflicting testimony."

Those are the parties' positions on what the magistrate "found." This is ours: the magistrate made no findings of any kind. Nowhere in the magistrate's ruling is there any express statement of what he "found," no indication of who he believed or who he did not. And most significantly, there was no finding where Spier was just before he jumped into the water. But to the extent there is an indication in the record what the magistrate viewed the evidence to be as to Spier's location, the People have the better of it.

As quoted above, in the course of his ruling the magistrate made at least two observations indicating his acceptance of the People's version of facts. At one point he stated that "it has to be Mr. Dawson's negligence that actually caused the death. And while a person shouldn't be allowed to stand on the back step, and accepting the People's evidence in its most sanguine light from their perspective, it didn't. That's not what caused the death of this individual." At another point the magistrate said this: "Yes, Mr. Spier's presence on the stern area or transom area of the boat put him in closer proximity to danger, but it was not the defendant's negligence per se that made that danger a push over into the area where he became the actual cause of the defendant's death or his negligence became the actual cause of the defendant's death." We read these comments as supporting the People's version of the "facts" as seen by the magistrate.

We find support for our conclusion in the words of the trial court when it denied the motion for reinstatement. There, and as also quoted above, the trial court observed that "I'm having difficulty getting over the magistrate said there's no actual cause of being on the step. To me that means that it didn't matter whether the victim was on the step or in the boat. And I think what the magistrate was saying was, because of the victim's truculent attitude and intoxication, that he would have simply leaped out of wherever he was on the boat and therefore it doesn't matter whether he was on the step or not." And,

the court concluded, "[T]he magistrate held that the victim's being on the ski step was not a cause of the accident."

The magistrate's determination, then, brings us to the standard of review.

### C. *The Standard of Review*

The People assert that the magistrate rendered strictly a legal conclusion as to the absence of probable cause, which we would review de novo. Defendant urges that the magistrate made a controlling finding of fact, which we would review for substantial evidence. (*People v. Childs, supra,* 226 Cal.App.3d at p. 1406.)[4] Again the People have the better of it, as the proper standard of review is that set out in *Slaughter, supra,* 35 Cal.3d 629, a case we find particularly compelling, as what occurred there is comparable, if not identical, to what occurred here.

Defendant Slaughter was charged with murder, and the prosecution introduced undisputed evidence that he and an accomplice conspired to commit a burglary, that a security guard was robbed and killed near the site of the burglary, and that the defendant acquired possession of the guard's gun. Despite that, the magistrate dismissed the charge, stating, " 'I think any murder liability would be vicarious liability . . . but even that is stretching too far. I do not see where there could be a holding order on the [murder] charge.' " (*Slaughter, supra,* 35 Cal.3d at p. 635.) The People made a motion to reinstate the charge, which was denied, and the People appealed. The Supreme Court reversed.

---

[4] There is much authority supporting the proposition that causation is a question of fact. (See 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1184, pp. 551–552, and numerous cases there cited; *People v. Harris* (1975) 52 Cal.App.3d 419, 427 [125 Cal.Rptr. 40] [question of whether defendant's unlawful act was a proximate cause of the death is a question for the trier of fact]; *Landeros v. Flood* (1976) 17 Cal.3d 399, 411 [131 Cal.Rptr. 69, 551 P.2d 389] [causation is a question of fact where the issue was whether the defendant's negligence was a substantial factor in causing injuries inflicted during a criminal attack by a third party]; *People v. Roberts* (1992) 2 Cal.4th 271, 320, fn. 11 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Only where the facts are undisputed is causation regarded as a question of law. (6 Witkin, *supra,* § 1184, p. 552.)

At the same time, it has been observed that causation questions "are not issues of fact in the sense of what happened physically, where and when, and with whose physical involvement in what ways. Rather, to decide, for example, whether a described consequence was 'foreseeable' one must apply to the determined physical facts a legal standard—the concept of 'foreseeability' as it is defined and explained in legal precedents. The decision to be made is an evaluative determination—an evaluation of the facts as measuring up to or not measuring up to the *legal* standard which has been set by the precedents defining 'forseeability' as used in this legal context. Even though this evaluative determination is not a factfinding in the usual what-happened sense, it is nevertheless a question that is to be decided by a jury to the same extent, no more and no less, as fact questions are to be decided by a jury." (Prosser & Keeton, Torts (5th ed. 1984) § 45, p. 320, fn. omitted, italics added.)

■ The court began its analysis by contrasting the burden on the People before the magistrate with their burden before a jury (*Slaughter, supra*, 35 Cal.3d at p. 637), and then set out the role of the magistrate: " 'Within the framework of his limited role, . . . the magistrate may weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses. [Citation.] In other words, in assisting him in his determination of "sufficient cause," the magistrate is entitled to perform adjudicatory functions akin to the functions of a trial judge. Yet the proceeding is not a trial, and if the magistrate forms a personal opinion regarding the guilt or innocence of the accused, that opinion is of no legal significance whatever in view of the limited nature of the proceedings.' [Citation.] [¶] In short, the magistrate is not a trier of fact. He does not decide whether defendant committed the crime, but only whether there is ' "some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' " (35 Cal.3d at p. 637.)

The Supreme Court then laid out the standard of review: "The character of judicial review . . . depends on whether the magistrate has exercised his power to render findings of fact. If he has made findings, those findings are conclusive if supported by substantial evidence. [Citations.] If he has not rendered findings, however, the reviewing court cannot assume that he has resolved factual disputes or passed upon the credibility of witnesses. A dismissal unsupported by findings therefore receives the independent scrutiny appropriate for review of questions of law. The cases arising under [Penal Code] section 739 explain this distinction." (*Slaughter, supra*, 35 Cal.4th at p. 638.)

The court then went on to discuss in detail cases holding that the magistrate had erred as a matter of law in dismissing changes without making factual findings, discussing *People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]; *Pizano v. Superior Court* (1978) 21 Cal.3d 128 [145 Cal.Rptr. 524, 577 P.2d 659]; and *People v. Farley* (1971) 19 Cal.App.3d 215 [96 Cal.Rptr. 478]. And the court then reached its conclusion: "There remains the matter of applying this standard in the present case. This does not present a difficult problem. The record presents no conflicts in the evidence and the magistrate rendered no findings of fact. He merely stated briefly that 'any murder liability would be a vicarious liability . . . , but even that is stretching too far. I do not see where there should be a holding order on the 187 charge.' [¶] This language is not very different from that used by the magistrates in *Beagle* and *Farley*. In the former case the magistrate dismissed a charge because the evidence was 'too weak' (see 6 Cal.3d 441, 457); in the latter because the evidence was 'insufficient' (see 19 Cal.App.3d 215, 221)." (*Slaughter, supra*, 35 Cal.3d at p. 642.)

As noted, defendant asserts that the magistrate determined causation and such determination is a question of fact. But the magistrate in *Slaughter* determined "vicarious liability" which, of course, means that one would be liable only because of a relationship with another. And whether such relationship exists is also a question of fact. (*L. Byron Culver & Associates v. Jaoudi Industrial & Trading Corp.* (1991) 1 Cal.App.4th 300, 305 [1 Cal.Rptr.2d 680] ["The existence of an agency is a factual question . . . ."]; *Yanchor v. Kagan* (1971) 22 Cal.App.3d 544, 550 [99 Cal.Rptr. 367] [ostensible agency]; *Kaljian v. Menezes* (1995) 36 Cal.App.4th 573, 586 [42 Cal.Rptr.2d 510] ["existence or nonexistence of a joint venture is a fact question . . ."]; *Billups v. Tiernan* (1970) 11 Cal.App.3d 372 [90 Cal.Rptr. 246] [partnership].)

*Dudley v. Superior Court* (1974) 36 Cal.App.3d 977 [111 Cal.Rptr. 797] (*Dudley*) is also instructive. The defendant there was charged with murder. Following a preliminary hearing, the magistrate concluded that there was " 'no evidence there from which the Court can conclude, either expressed or implied malice existed in this case.' " (*Id.* at p. 980.) The district attorney nevertheless filed an information charging the defendant with murder, and the superior court denied the defendant's motion to dismiss the information. (*Id.* at p. 978.) On the defendant's petition for prohibition, the Court of Appeal considered whether the magistrate's finding on malice was "the kind of fact finding which binds the district attorney, as in *Jones*[, *supra*, 4 Cal.3d 660]." (*Dudley, supra,* 36 Cal.App.3d at p. 982.) The court concluded it was not, observing, "[T]here is no showing that the magistrate disbelieved the testimony describing the homicidal assault which is the basis of the prosecution's case. The unimpeached, credible evidence received at the preliminary examination supports an inference of malice and gives probable cause to try petitioner for murder, but the magistrate acted upon his personal opinion that the offense was no more than manslaughter." (*Id.* at p. 985.) As a result, the "district attorney was entitled to 'challenge the magistrate's ultimate finding' that the evidence was insufficient." (*Ibid.*)

*Pappert v. San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205 [186 Cal.Rptr. 847], while a civil case and not involving a magistrate, is particularly apt. The facts there were that the top of a tree in Pappert's yard was dangerously close to an uninsulated power line of the defendant utility company. Pappert attempted to trim the tree himself, and was electrocuted. His widow and children sued for wrongful death. The jury was instructed on the foreseeability of intervening acts, but not on the foreseeability of the harm. The jury returned a special verdict finding that the defendant was negligent but also determining that its negligence was not a legal cause of Pappert's death. (*Id.* at pp. 207–209.)

The Court of Appeal reversed, concluding there was error in instructions: "If properly instructed, the jurors could only have concluded, even though

they found SDG&E could not have reasonably foreseen the specific nature of decedent's negligent conduct, its original negligence in installing an uninsulated, high-voltage wire, or in failing to trim the tree away from the wire, exposed persons within decedent's class to a foreseeable risk of electrocution . . . ." (*Pappert v. San Diego Gas & Electric Co., supra,* 137 Cal.App.3d at p. 211.) As pertinent here, the jury made a determination of causation. But it was not based on the proper law.

That, we conclude, is what happened here: the magistrate did not apply the proper law of causation.

### D. *The Law of Causation*

It is well established that the principles of causation as they apply to tort law are equally applicable to criminal law. (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46–47 [51 Cal.Rptr.2d 185] (*Schmies*); *People v. Roberts, supra,* 2 Cal.4th 271, 318–319 [relying on tort cases for authority regarding causation in a homicide case].) And as in tort law, the defendant's act must be the proximate cause of the injury, death, or other harm constituting the crime. (*Schmies, supra,* 44 Cal.App.4th at pp. 46–47; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 35, pp. 241–242; accord, *People v. Armitage* (1987) 194 Cal.App.3d 405, 419–420 [239 Cal.Rptr. 515] ["In order to be guilty of felony drunk boating the defendant's act or omission must be the proximate cause of the ensuing injury or death."].)

We thus turn to the law of proximate cause, well described by our colleagues in Division Three, in *People v. Brady, supra,* 129 Cal.App.4th 1314 (*Brady*). *Brady* involved an appeal by two defendants, Brady and Mortensen, both of whom were convicted of manufacturing, and conspiring to manufacture, methamphetamine. Brady was also convicted of recklessly causing a fire that resulted in the death of two firefighter pilots whose planes collided while they were responding to the fire near the methamphetamine lab. Brady's "primary contention on appeal [was] that the jury instructions and the exclusion of four categories of evidence precluded the jury from properly determining whether his conduct proximately caused the death of the pilots." (*Id.* at p. 1318.) More specifically, Brady argued that "the intervening acts of the pilot Groff and others were superseding causes that absolved him of responsibility for the two deaths." (*Id.* at p. 1323.) The Court of Appeal rejected these contentions, in a scholarly opinion which began its analysis with an exhaustive exposition of the law of proximate cause:

■ " 'The principles of causation apply to crimes as well as torts. [Citation.] "Just as in tort law, the defendant's act must be the legally responsible cause (*'proximate cause'*) of the injury, death or other harm

which constitutes the crime." ' [Citation.] So too, California criminal law relies on civil law formulations of concurrent and superseding cause. [Citations.] [¶] ' "[T]he law defines 'cause' in its own particular way." ' [Citation.] A 'cause of [death] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur.' (CALJIC No. 3.40.) In *People v. Roberts, supra,* 2 Cal.4th 271, the Supreme Court emphasized the primary significance of foreseeability to proximate cause. 'The object of the criminal law is to deter the individual from committing acts that injure society by harming others, their property, or the public welfare, and to express society's condemnation of such acts by punishing them. "The purpose of the criminal law is to define socially intolerable conduct, and to hold conduct within . . . limits . . . reasonably acceptable from the social point of view." [Citation.] "Modern penal law is founded on moral culpability. The law punishes a person for a criminal act only if he is morally responsible for it. To do otherwise would be both inhumane and unenlightened. . . ." ' '

█ " 'In general, "[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating." ' [Citation.] If an intervening act, event or force is present, however, it is necessary to determine whether that act, event or force is sufficient to absolve the defendant of liability 'because the "defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause." ' [Citations.]

█ " 'In law, the term "superseding cause" means "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible." ' [Citation.] . . . ' "[W]here [an] injury was brought about by a later cause of independent origin . . . [the question of proximate cause] revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable. If *either* of these questions is answered in the affirmative, then the defendant is not relieved from liability towards the plaintiff . . . ." ' [Citation.] Thus, '[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act.' [Citations.]" (*Brady, supra,* 129 Cal.App.4th at pp. 1324–1326, fn. omitted.)

█ Later, the court applied that law to Brady's specific contentions, including his claim that the trial court erred in excluding evidence of the

blood-alcohol level of the pilot Groff. After holding that exclusion of the evidence was not error, the court ended with this: "In any event, Brady's attempt to define Groff's 'intentional misconduct of flying under the influence of alcohol' as a superseding cause of the pilots' deaths is unavailing. The issue of proximate causation is increasingly being viewed in terms of the scope of the risk created by the wrongdoer's conduct. (See, e.g., 1 Dobbs, The Law of Torts (2001) §§ 186–187, pp. 460–464; [citation].) '[C]ourts usually reduce the tests of proximate cause, both in direct and in intervening cause cases, to a question of foreseeability. To some extent, the language of foreseeability is a short hand expression intended to say that the scope of the defendant's liability is determined by the scope of the risk he negligently created.' (1 Dobbs, *supra*, § 187, p. 463.) '. . . Consequently, the issue in intervening cause cases, like the issue in others, is whether the general type of harm inflicted was foreseeable and thus within the risk of harm created by the defendant's negligent conduct.' (*Id.* (2004 supp.) § 197A, pp. 92–93.) . . . This assessment is in full accord with the principles long articulated by California courts. ' "[I]t is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act." ' (*Schmies, supra*, 44 Cal.App.4th at p. 50; see also *People v. Crew* [(2003)] 31 Cal.4th [822,] 847 [3 Cal.Rptr.3d 733, 74 P.3d 820] [a 'defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act'].)" (*Brady, supra,* 129 Cal.App.4th at pp. 1333–1334, fn. omitted.)

### E.   *The Type of Harm Was Foreseeable*

As quoted above, the magistrate held that what caused Spier's death was his jumping off while the boat was in reverse. We interpret this as concluding, in proximate cause terminology, that Spier's act was an unforeseeable intervening cause. Assuming without deciding that the magistrate was correct in this conclusion, this means that the magistrate addressed the first question pertinent to proximate cause as discussed in *Brady*. But he did not discuss the second: whether defendant's conduct "caused injury of a type which was foreseeable."

■  As is clear from the magistrate's ruling, he did not even mention, much less analyze or answer, this second question. In the words of *Brady*, " ' "[i]f *either* of these questions is answered in the affirmative, then the defendant is not relieved from liability . . . ." ' " (*Brady, supra,* 129 Cal.App.4th at p. 1326.) Or, as Witkin states the rule: "The foreseeability required is of the *risk of harm*, not of the particular intervening act. In other words, the defendant may be liable if his or her conduct was 'a substantial factor' in bringing about the harm, though the defendant neither foresaw nor

should have foreseen the extent of the harm or the manner in which it occurred. [Citations.]" (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1198, p. 576, citing numerous cases.) And the risk that Spier would end up in the water near a churning propeller was foreseeable.

The accident occurred hours after Spier, already "beyond intoxicated," had continued in those hours to consume alcohol. He was on defendant's boat, belligerently taking issue with all requests and commands, and reluctant to follow safety instructions. He had shortly before attempted to water-ski, albeit unsuccessfully, and, still wearing his life vest, continued to insist on water-skiing. And all indications are he would, as shown by the testimony of Martino, who acknowledged that he left his post as operator of the boat to search for a bigger flag specifically for this reason.[5] It was, in short, eminently foreseeable that Spier would again enter the water. And what more likely place to enter than the ski step, which was almost directly above the propeller.

The boat had multiple warnings, one on the ski step itself, where a sticker says, "Danger. Keep away from rear boat while running to avoid personal injury." Another warning by the throttle said, "Danger. Avoid serious injury, shut off and/or do not start engine before allowing anyone on or about swim platform." And Officer Peccorini testified that one of the two main concerns of operating a boat with someone on the platform was injury from a propeller, the very cause of Spier's tragic death.

The People's brief asserts that "[w]hether [Spier] jumped, was pushed, lost his balance and fell, lost consciousness, or was struck by [lightning] and fell is legally irrelevant to a determination whether the type of injury caused by defendant's conduct was foreseeable." We are not prepared to go quite that far. We are, however, prepared to conclude that it was foreseeable that Spier would end up in the water, and thus subject to the risk of harm from a moving propeller. And defendant was the "captain of the ship," and with that came the concomitant responsibility to those on board, even if—indeed, particularly if—they were intoxicated.

In equally colorful language defendant asserts that, "Short of defendant clapping Spier in irons and confining [him] to an improvised brig somewhere on the ski boat, defendant could not have done more to ensure Spier's safety." We do not agree with that either. Whether Dawson is in fact guilty is a subject for another day. What we hold is that it was error for the magistrate to refuse to hold Dawson to answer—and error for the superior court not to reinstate the charges.

---

[5] Defendant's brief describes Martino as "the most attentive, sober and responsible of the witnesses."

## III.  DISPOSITION

The order and judgment denying the People's motion for reinstatement is reversed.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied April 22, 2009, and respondent's petition for review by the Supreme Court was denied July 8, 2009, S172890.