Filed 2/16/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B327473 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BA498018) |
| v. | |
| WOODROW KIM et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Norman J. Shapiro, Judge. Reversed and remanded with instructions.

George Gascon, District Attorney, and Tracey Whitney, Deputy District Attorney, for Plaintiff and Appellant.

Bobbitt, Pinckard & Fields and Richard L. Pinckard for Defendant and Respondent Woodrow Kim.

Law Offices of Pelayes & Yu and Tom Yu for Defendant and Respondent Jonathan Miramontes.

# I.    INTRODUCTION

The Los Angeles County District Attorney appeals from an order denying the prosecution's motion under Penal Code section 871.5[1] to compel the magistrate to reinstate charges accusing defendants[2] of filing false peace officer reports in violation of former section 118.1.[3]  According to the District Attorney, the evidence presented at the preliminary hearing was sufficient to allow this matter to proceed to trial on the charged offenses.  We reverse.

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

[2]    Defendants are Los Angeles County Sheriff's Department Deputies Woodrow Kim and Jonathan Miramontes.

[3]    Former section 118.1 was repealed effective January 1, 2022, and replaced with current section 118.1.  (Stats. 2021, ch. 267, § 1.)  The changes to the provision implemented by that repeal and reenactment are not relevant to this appeal. Therefore, all further references to section 118.1 will be to the language of that provision in effect at the time defendants allegedly committed the charged offenses, September 19, 2018.

## II. FACTUAL BACKGROUND

### A. *Officer-Involved Shooting*[4]

On September 19, 2018, Deputy Kim was working a regular patrol assignment with his partner Deputy Miramontes. Deputy Kim was driving their patrol car that day. The deputies received a call advising that a Sheriff's unit following a black BMW had requested assistance in executing a traffic stop. Based on the call, defendants understood that someone in the BMW confronted a person, announced a gang affiliation, asked that person where he was from, and then pointed a gun at him. Deputy Kim thus believed at least one occupant of the BMW was armed.

The deputies responded and followed the BMW along with two other patrol cars into the east parking lot of Salazar Park, a location known to Deputy Miramontes for gang activity. The BMW proceeded through the parking lot, but then turned, jumped a curb, and drove into the park, traveling at a high rate of speed across the grass playing fields. As the BMW came to a stop near a cul-de-sac, one of the occupants, Martinez, exited and ran across the grass. The ensuing interaction between Martinez and defendants' patrol car, as described in their police reports, is the focus of this appeal. At approximately the same time as that interaction, deputies from the other two patrol cars were involved in a shooting incident near the cul-de-sac during which two

---

[4] The facts of the pursuit of the suspect vehicle and subsequent officer-involved shooting are undisputed and included to lend context to the reports describing defendants' interactions with one of the suspects, Hector Martinez.

deputies were shot and the two remaining occupants of the BMW were killed.

B.    *Deputies' Statements at the Scene*

On the evening of September 19, 2018, Sergeant Michael Lennig responded to the command post near the Salazar Park shooting scene.  He spoke with two field sergeants who advised that, shortly after the incident, Deputies Kim and Miramontes had reported being in a "'traffic collision'" with Martinez.

C.    *Deputy Kim's Report* (September 19, 2018)

On the day of the shooting, Deputy Kim filed a report, entitled "Supplemental Report" and bearing a Los Angeles County Sheriff's Department file number.  The report described the crime as "Attempt[ed] murder on a peace officer" and listed Martinez's name and booking number.  In that report, Deputy Kim described his pursuit of the BMW and then provided the following statement concerning the deputies' interactions with Martinez:  "While driving to the location of the [black BMW], I saw a male Hispanic (later identified as Martinez . . .) exit the passenger side of the vehicle and run west through the park[.]  I drove my patrol vehicle towards the direction of S/Martinez.  I positioned and drove my patrol vehicle approximately six feet north from S/Martinez.  As I got closer to S/Martinez, I opened my driver side door believing my partner and I would get into a foot pursuit of [him].  As I closed the gap between S/Martinez and our patrol vehicle, [he] stopped running and began walking towards our patrol vehicle.  I attempted to stop my patrol vehicle

4

to prevent a collision with S/Martinez. [He] walked closer to our patrol vehicle and collided with the front passenger [(*sic*)] door. After S/Martinez collided with the driver side door he was still standing. I ordered S/Martinez to lay on the ground. As my partner and I were detaining S/Martinez at gun point, I heard approximately 10–15 gunshots from the area of where the suspect vehicle was stopped[.]"

D.      *Deputy Miramontes's Report* (September 19, 2018)

On the day of the shooting, Deputy Miramontes also filed a supplemental report bearing the same Los Angeles County Sheriff's Department file number, describing the crime as "Attempt[ed] Murder on a Peace Officer," and listing Martinez's name and booking number. Deputy Miramontes wrote: "I saw a male Hispanic (later identified as S/Martinez) [ ] exit the suspect vehicle front passenger door and begin running west through the grass field. We followed S/Martinez with our vehicle in an attempt to detain him and saw he was running toward a narrow walkway that was constricted by fencing. Due to the fact that our patrol vehicle would not be able to continue following S/Martinez, I unbuckled my seatbelt and opened my door pending the possibility of a foot pursuit of an armed assault with a deadly weapon suspect. It should be noted that there were several children and families in the surrounding park area. [¶] My partner (Deputy Kim) immediately brought our vehicle to a halt as soon as we saw S/Martinez attempt to give up suddenly stopping and turning toward us. I exited our vehicle and ordered S/Martinez to lay on the ground and show me his hands. Simultaneously, I heard several gunshots behind me. Deputy

5

Kim provided cover for me as I handcuffed S/Martinez without further incident."

E.      *Traffic Collision Investigation* (September 20, 2018)

The day following the shooting, Sergeant Lennig and Lieutenant Edmundo Torres interviewed Martinez, who claimed that he had been "run over" by deputies.  Sergeant Lennig decided to conduct an inquiry.  He first spoke to Deputy Kim who informed him that there was "a lot of commotion going on" at the Salazar Park scene because two deputies had been shot.  The deputy also said that the officers were "scared for their lives." Using a Google map, Deputy Kim showed the sergeant the location of the collision with Martinez.

Sergeant Lennig also spoke to Deputy Miramontes on the evening of September 20, 2018.  The deputy told him that they "'crashed in[to]'" or "'collided . . . with'" Martinez.

F.      *Video of Martinez Apprehension*

Investigators obtained residential surveillance video footage of the incident that occurred on September 19, 2018, at Salazar Park.  The video shows defendants' patrol car traveling at high speed across the grass field of the park.  The view of the car is then blocked by some trees; but when the car comes back into view, the video shows Martinez upright just as the car's driver's door makes contact with him.  Following the impact, Martinez is thrown forward, tumbles to the ground, rolls several times, and then lies motionless.  The patrol car comes to a

6

complete stop and Deputy Miramontes exits just before Martinez finishes rolling on the ground.

## III.   PROCEDURAL BACKGROUND

On August 25, 2021, the District Attorney filed a felony complaint alleging in count 1 that defendants filed false peace officer reports in violation of section 118.1; and in count 2 that Deputy Kim assaulted Martinez in violation of section 149.[5]  On August 11, 2022, the Honorable Ronald S. Coen, sitting as a magistrate, held a preliminary hearing.  Following testimony and arguments, Judge Coen stated, as relevant to count 1, "[A]nd going back over my notes and going back over the viewing of the evidence, counsel has convinced me.  I see insufficient evidence as to count 1 as to each defendant."  He then dismissed the complaint.

On August 24, 2022, the prosecution filed a motion under section 871.5 to compel the magistrate to reinstate the complaint.  Following a hearing on September 22, 2022, the trial court, the Honorable Norman Shapiro presiding, denied the motion.

The District Attorney filed notices of appeal from the denial of the section 871.5 motion[6] on November 21, 2022.

---

[5]    At the preliminary hearing, the prosecution submitted to the dismissal of count 2 and the District Attorney does not request reversal of that ruling.

[6]    Section 1238, subdivision (a)(9) provides that "[a]n appeal may be taken by the people from" "[a]n order denying the motion of the people to reinstate the complaint or a portion thereof pursuant to Section 871.5."

7

## IV.  DISCUSSION

### A.  *Standard of Review*

"On appeal from an order denying a motion to reinstate a criminal complaint under section 871.5,[7] we disregard the superior court's ruling and directly examine the magistrate's ruling to determine if the dismissal of the complaint was erroneous as a matter of law." (*People v. Massey* (2000) 79 Cal.App.4th 204, 210.)  If the magistrate makes factual findings, we review those findings for substantial evidence.  (*People v. Slaughter* (1984) 35 Cal.3d 629, 639 (*Slaughter*).)  But if the magistrate makes no factual findings, we review the decision dismissing the charges de novo.  (*Id.* at pp. 641–642.)  Such findings are "erroneous as a matter of law if the evidentiary record discloses a rational basis for believing the defendant guilty of the charged crime." (*Id.* at p. 642.)

### B.  *Analysis*

Here, the magistrate made no factual findings when he dismissed the complaint.  We therefore consider whether the evidentiary record discloses a rational basis for believing that the defendants are guilty of violating section 118.1.

---

7       Section 871.5, subdivision (a), provides in pertinent part: "When an action is dismissed by a magistrate . . . , the prosecutor may make a motion in the superior court within 15 days to compel the magistrate to reinstate the complaint or a portion thereof and to reinstate the custodial status of the defendant under the same terms and conditions as when the defendant last appeared before the magistrate."

8

### 1.    Section 118.1

Defendants were charged in August 2021 with violating section 118.1, subdivision (a) which, at that time, provided: "Every peace officer who files any report with the agency which employs him or her regarding the commission of any crime or any investigation of any crime, if he or she knowingly and intentionally makes any statement regarding any material matter in the report which the officer knows to be false, whether or not the statement is certified or otherwise expressly reported as true, is guilty of filing a false report punishable by imprisonment in the county jail for up to one year, or in the state prison for one, two, or three years.  This section shall not apply to the contents of any statement which the peace officer attributes in the report to any other person."

As charged, the offense of filing a false report required the prosecution to prove that:  (1) the defendant was a peace officer; (2) the defendant knowingly and intentionally made a statement in a report filed with the agency that employed him; (3) the statement was made regarding the commission or investigation of a crime; (4) the statement was false; (5) the statement was material; and (6) the defendant knew the statement was false. We consider below, as to each defendant, the preliminary hearing evidence in support of each of those elements under the de novo standard governing our review.

## 2. Deputy Kim

First, there is no dispute that, as a deputy of the Los Angeles County Sheriff's Department, Deputy Kim was a "peace officer." (§ 830.1, subd. (a).) And, our review of Deputy Kim's September 19, 2018, report demonstrates that it is a Los Angeles County Sheriff's Department "Supplemental Report" that was filed by the deputy with that Department regarding an "Attempt[ed] murder on a peace officer." Thus, we reject Deputy Kim's characterization of the report as "essentially reporting a collision—a traffic event" that did not relate to the commission or investigation of any crime. Instead, the evidence supported a rational inference that the report was a peace officer report regarding the investigation of the attempted murders of fellow officers.

There is also no dispute that Deputy Kim, as the author of the report who submitted it during the regular course of his duties, knowingly and intentionally made the challenged statements in that report. As to whether Deputy Kim's statements in the supplemental report describing the collision with Martinez were false, the deputy stated that Martinez "walked closer to our patrol vehicle and collided with the front passenger [(*sic*)] door. After S/Martinez collided with the driver side door he was still standing." The surveillance video, however, depicted the patrol car's door hitting Martinez with sufficient force to propel him forward and then to the ground. Thus, Deputy Kim's statement that Martinez was "still standing" after the impact was false.

We next consider whether the false statement was material. We have found no case defining the term "material" in

10

the context of a prosecution for filing a false report in violation of section 118.1.  That term, however, has been defined in cases involving prosecutions for perjury in other contexts.  For example, in the context of perjury prosecutions under section 118 based on false testimony at trials and administrative hearings, a statement is material if it is probable that it would "influence[ ] the outcome of the [relevant] proceedings."[8]  (*People v. Pierce* (1967) 66 Cal.2d 53, 61.)  In perjury cases more analogous to this one, however, in which the prosecution is based on the filing of a false affidavit or declaration under perjury, there is no "proceeding" the outcome of which could be influenced by submission of a false statement.  (*People v. Hedgecock* (1990) 51 Cal.3d 395, 405.)  Thus, in a prosecution based on a false filing, "an omission or misstatement of fact is material if there is a substantial likelihood that a reasonable person would consider it important in evaluating" the information reported against the purpose for which it is required.  (*Id*. at p. 406; see *People v. Rubio* (2004) 121 Cal.App.4th 927, 933 ["material" is defined as "'important, essential, or pertinent (*to* the matter under discussion)[ ]' (Webster's New World Dict. (3d college ed. 1988, p. 834)[ ]"; therefore, "the false statement [in the filing] must be important to the matter under discussion"].)

In determining the proper construction of the term material as used in section 118.1, we may also consider the

---

[8]	CALCRIM No. 2640, the jury instruction used in prosecutions for perjury under section 118 based on false testimony at trial, defines "material" as follows:  "Information is *material* if it is probable that the information would influence the outcome of the proceedings, but it does not need to actually have an influence on the proceedings."

legislative history of that section.  (See *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544 [interpretation of statutory language may be confirmed by review of legislative history]; *Haniff v. Superior Court* (2017) 9 Cal.App.5th 191, 202 [legislative history may provide additional authority confirming the court's interpretation of a statute].)  Our review of that history shows that section 118.1 was enacted to deter the practice of "'creative report writing'" by police officers and hold them more accountable for false reporting.  (Sen. Boatwright, sponsor of Sen. Bill No. 2681 (1989–1990 Reg. Sess.), letter to Sen. Rules Com., Mar. 7, 1990, p. 4; Sen. Com. on Judiciary, com. on Sen. Bill No. 2681 (1989–1990 Reg. Sess.), Apr. 24, 1990, pp. 2, 3; Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Sen. Bill No. 2681 (1989–1990 Reg. Sess.) May 22, 1990, p. 2; Sen. Rules Com., Off. of Sen. Floor Analysis, Rep. on Sen. Bill No. 2681 (1989–1990 Reg. Sess.) Aug. 17, 1990, p. 2; Sen. Boatwright, letter to Governor George Deukmejian re:  Sen. Bill No. 2681 (1989–1990 Reg. Sess.), Aug. 23, 1990, Governor's chaptered bill file.)

In 1990, the Legislature considered a bill proposed by Senator Daniel Boatwright in response to a well-publicized traffic-stop arrest of off-duty City of Hawthorne police officer Don Jackson by officers from the City of Long Beach.  While engaged in a private "sting" operation, Jackson was stopped, reportedly without cause, by two Long Beach officers, one of whom swore at Jackson and then pushed his head through a plate glass window.  The encounter was recorded by television cameras that were following Jackson.  The officers' report of the incident deviated substantially from the events depicted in the video tape, and one of the officers subsequently admitted making false statements in the report after being confronted with the video.  (Sen. Com. on

12

Judiciary, com. on Sen. Bill No. 2681 (1989–1990 Reg. Sess.), Apr. 17, 1990, p. 2; Sen. Boatwright, sponsor of Sen. Bill No. 2681 (1989–1990 Reg. Sess.), letter to Sen. Rules Com., Mar. 7, 1990, pp. 1–2.)

A Senate Select Committee held a hearing to examine the Jackson incident, which included testimony that officers did not take the current punishments for filing false reports seriously. (Sen. Com. on Judiciary, com. on Sen. Bill No. 2681 (1989–1990 Reg. Sess.), Apr. 17, 1990, p. 2; Sen. Com. on Judiciary, com. on Sen. Bill No. 2681 (1989–1990 Reg. Sess.), Apr. 24, 1990, p. 3; Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Sen. Bill No. 2681 (1989–1990 Reg. Sess.) May 22, 1990, p. 2.) Following the hearing, Senator Boatwright introduced Senate Bill No. 2681 to give teeth to the offense of filing a false report[9] by making it part of section 118, which defined the offense of perjury and punished it as a felony. (Sen. Bill No. 2681 (1989–1990 Reg. Sess.), as introduced Mar. 2, 1990; Sen. Boatwright, sponsor of Sen. Bill No. 2681 (1989–1990 Reg. Sess.), letter to Sen. Rules Com., Mar. 7, 1990, pp. 1, 4.) In response to certain objections, however, the offense was removed from section 118 and inserted in a new section 118.1. (Sen. Amend. to Sen. Bill No. 2681 (1989–1990 Reg. Sess.) May 2, 1990; Assem. Amend. to Sen. Bill No. 2681 (1989–1990 Reg. Sess.) June 26, 1990, pp. 1–3.) The new offense was no longer defined as perjury, but rather

---

[9] At the time, Government Code section 6204 defined the offense of filing a false police report and punished it as a misdemeanor. (Former Gov. Code, § 6204.) That section was repealed by the enactment of section 118.1.

as the crime of filing a false report punishable as a "wobbler."[10] (Assem. Amend. to Sen. Bill No. 2681 (1989–1990 Reg. Sess.) June 26, 1990, at p. 3.) The Governor signed the revised version of section 118.1 on September 14, 1990 (Stats. 1990, ch. 950, § 3), and it remained substantially unchanged as the offense charged in this case on August 25, 2021.

In successfully arguing for its passage, advocates of Senate Bill No. 2681 emphasized the importance of ensuring that police officers complied with their obligations to file accurate and truthful peace officer reports. That background thus supports a construction of the materiality requirement similar to the definition of materiality in the context of the false filing cases discussed above. Specifically, the materiality of a peace officer statement in a report should be evaluated in light of the purpose for which it is required and consistent with the enactment's underlying policy of encouraging accurate and truthful report writing. A statement therefore is material if there is a substantial likelihood that a reasonable person reviewing the statement would deem it to be an important part of the police report, and not a trivial detail.

Deputy Kim's statements were material because, in our view, they are precisely the type of "creative report writing" that section 118.1 was enacted to deter. He was tasked with providing a reliable description of the pursuit, the shootings, and the deputies' apprehension, without purported incident, of Martinez, who had been a passenger in the BMW at the center of the officer-involved shootings in Salazar Park. Thus, a rational fact

---

[10]     A "wobbler" is "an offense which may be charged and punished as either a felony or a misdemeanor." (*Davis v. Municipal Court* (1988) 46 Cal.3d 64, 70.)

14

finder could deem Deputy Kim's statement that the fleeing Martinez walked into defendants' patrol car and remained standing after contact an important part of the police report, and not a trivial detail. (See *People v. Korbin* (1995) 11 Cal.4th 416, 430 [materiality is an issue of fact for the jury].)

Finally, we consider whether there was a rational basis for believing that Deputy Kim knew the statement was false. This inquiry focuses on the deputy's state of mind at the time he authored and submitted his supplemental report. (See *People v. Madrid* (1992) 7 Cal.App.4th 1888, 1899 [a showing that a peace officer affidavit in support of search warrant contains material omissions or misstatements which were made either intentionally or with a reckless disregard for the truth "must focus on the state of mind of the affiant"].)

Deputy Kim argues that his fear during the incident could have altered his perception, such that his statement about his interaction with Martinez was not knowingly false. He also contends that his oral admissions about being involved in a traffic collision demonstrate that he innocently or mistakenly made a false statement and thus did not act with the requisite criminal intent. These arguments could prove persuasive at later stages of the proceedings, depending on the evidence presented. But, at the preliminary hearing stage, the magistrate "does not decide whether [the] defendant committed the crime, but only whether there is "'some rational ground for assuming the possibility that an offense has been committed . . . .'"" (*Slaughter, supra*, 35 Cal.3d at p. 637.)

Deputy Kim was just on the other side of the driver's door of his patrol car when it impacted Martinez, close enough to have a clear view of the event as depicted in the video. It is thus

15

reasonable to infer that he observed Martinez being knocked to the ground and that, at the time he authored his supplemental report, he knew that his description of Martinez walking toward the patrol car, colliding with the door, and having the ability to remain standing following the collision was false.

### 3. Deputy Miramontes

We next consider whether the magistrate erred when he dismissed count 1 as to Deputy Miramontes. For the reasons we discuss above in connection with Deputy Kim's supplemental report, we conclude that the prosecution sufficiently demonstrated that Deputy Miramontes was a peace officer who knowingly and intentionally filed a report with the agency that employed him "regarding the commission of any crime or any investigation of any crime." (§ 118.1, subd. (a).)

As to whether the evidence at the preliminary hearing provided a rational basis for concluding that the deputy's challenged statement was false, the District Attorney argues that Deputy Miramontes's supplemental report was false and misleading due to a material omission: It did not "mention that the patrol car door struck Martinez at all." Deputy Miramontes counters that his supplemental report was accurate because he correctly described Martinez's actions, namely, "he stated that Martinez turned around and the video evidence uncontrovertibly demonstrates this."

For purposes of this appeal, we need not decide whether material omissions, as opposed to affirmative statements of fact, can form the basis of a prosecution under section 118.1. Nor do we need to resolve whether the video depicts Martinez turning

16

toward the patrol car just prior to the collision. Deputy Miramontes's report includes at least two affirmative statements of fact that a reasonable trier of fact could have found false: (1) "[m]y partner (Deputy Kim) immediately brought our vehicle to a halt as soon as we saw S/Martinez attempt to give up . . ."; and (2) "I exited our vehicle and ordered S/Martinez to lay on the ground . . . ."

The video evidence demonstrates that defendants' patrol car came to a stop only after striking Martinez, and not immediately upon Martinez purportedly "attempt[ing] to give up." Moreover, although the clips do not include audio, the sequence of events depicted in the video, which show that Martinez was already lying on the ground when Deputy Miramontes exited the patrol car, supports an inference that Miramontes did not "order" Martinez to lay on the ground. Indeed, given that sequence, such an order would have been superfluous.

But even if Deputy Miramontes ordered Martinez to the ground, in the context of the supplemental report, his statement, which immediately follows a description of Martinez turning toward the car, suggested that Martinez went to the ground of his own volition, and only after the deputy's order. Any such suggestion, however, was contrary to the video's depiction of Martinez being knocked to the ground by the patrol car and thereafter lying motionless as Deputy Miramontes emerged from the car. The video evidence thus supported a rational basis for believing that the deputy's statements were false.

As to whether these false statements were material, as we discuss above in connection with Deputy Kim's report, a rational

17

fact finder could find that the statements were important parts of Deputy Miramontes's report and not trivial details.

Finally, as to whether Deputy Miramontes knew that his statements were false, as a passenger in the patrol car in close pursuit of Martinez, he was in a position to observe whether Deputy Kim immediately stopped the car after Martinez purportedly gave himself up (as written in the report), or stopped the car only after colliding with Martinez (as depicted in the video). Similarly, as the arresting officer, Deputy Miramontes was in a position to know whether Martinez went to the ground as a result of his order, or was knocked to the ground before any such order could be given. Accordingly, the evidence was sufficient to meet the prosecution's relatively low burden of proof at the preliminary hearing.

### 4. Conclusion

Based on our de novo review of the evidentiary record, we conclude there is a rational basis for believing that each defendant committed the crime of filing a false report in violation of section 118.1. Therefore, the trial court erred by denying the motion to compel the magistrate to reinstate the complaint.

C. *Remand*

Defendants argue that, if we reverse the order denying the District Attorney's motion to reinstate the complaint, the matter should be remanded to the magistrate for specific factual findings. We disagree. We have determined the issue of probable cause as a matter of law; thus, there would be no purpose served

18

by remanding to allow the magistrate to exercise his discretion to make factual findings in support of his dismissal order.  (See *People v. Childs* (1991) 226 Cal.App.3d 1397, 1409.)

Deputy Miramontes also requests that we remand to allow the magistrate to determine under section 17, subdivision (b) that the matter is a misdemeanor.  We will remand to the trial court with instructions to enter a new order compelling the magistrate to reinstate count 1 as to both defendants and returning the matter to the magistrate for resumption of proceedings pursuant to section 871.5, subdivision (e).  Nothing in this opinion precludes a defendant, upon the resumption of proceedings before the magistrate, from making a motion pursuant to section 17, subdivision (b).

19

## V.    DISPOSITION

The trial court's order denying the motion to compel the magistrate to reinstate the complaint is reversed and the matter is remanded to the trial court with instructions to enter a new order granting the motion and returning the matter to the magistrate for resumption of proceedings pursuant to section 871.5, subdivision (e).

KIM, J.

We concur:

BAKER, Acting P. J.

MOOR, J.