[Nos. F012068, F012265. Fifth Dist. Jan. 17, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES CHILDS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of sections II through VI of part A and all of part B.

**COUNSEL**

Jim Fahey, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, W. Scott Thorpe and Ruth M. Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN (G. A.), J.***—Appellant James Childs appeals from judgments entered in two separate cases, superior court case No. 37477 and case No. 37589, consolidated for disposition on appeal.

In case No. 37477, his appeal is from the judgment entered on a jury verdict finding him guilty of three counts of grand theft by false pretenses (Pen. Code, § 487, subd. 1)[1] and one count of petty theft.

In case No. 37589, he appeals from a judgment entered on his plea of no contest to one count of unlawfully recording confidential communications

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] All code references are to the Penal Code unless otherwise indicated.

(§ 632) as part of a plea bargain pursuant to which six like counts were dismissed.

## PART A

### Case No. 37477

### FACTS

Appellant was a personnel officer at Kern Medical Center. His immediate supervisor was assistant hospital administrator Deborah Roberts.

The Immigration and Naturalization Service (INS) has a program to allow noncitizen nurses to enter the United States for employment up to a period of five years. The prospective employer must file a petition with the INS on the appropriate forms. The permit is known as an H-1 visa.

One of appellant's principal duties as personnel officer was to ensure that those employees and prospective employees who were not United States citizens possessed the necessary authorization to work at Kern Medical Center (KMC) in accordance with the requirements set forth by INS. In particular, appellant was responsible for ensuring that aliens had valid H-1 visas. In some cases this meant appellant was responsible for helping prospective employees obtain their H-1 visas; in other cases it meant that he was responsible for helping them transfer their H-1 visas from other hospitals where they had previously worked to KMC.

KMC's alien employees and would-be employees occasionally needed and received appellant's help with other immigration matters as well. If the alien's Social Security card required some sort of correction, for instance, it was appellant's duty to direct the alien to the Social Security office. It was not appellant's duty to get dependents listed on the H-1 visa or part of his duty to obtain permanent resident visas known as sixth preference visas.

KMC imposed no charges upon employees for these services though the aliens were required to pay the fees imposed by INS.

On August 31, 1987, Deborah Roberts had a meeting with Childs and chief executive officer Geoffrey Lang. Roberts had received an anonymous accusation from a KMC nurse that appellant was demanding fees for processing INS documents. When Lang confronted appellant with this accusation, appellant denied it and replied that he would not do something of that nature. Lang described appellant's reaction as "[s]hock, surprise, appeared to be surprised that such an assertion was made." Roberts informed appel-

lant that he was expected to assist prospective and current employees with processing INS papers to allow employment at KMC. Roberts testified that appellant was "specifically told that there were to be no fees charged other than those required by the [INS]." Appellant replied he was in the final stages of opening a private immigration consultation business. Roberts emphasized that "neither prospective employees nor those who were employed at [KMC] should be accepted in his business because this would constitute conflict of interest." Roberts also informed appellant that KMC employees were responsible for providing the necessary documentation, but appellant could direct employees to the Social Security office or the hall of records if necessary. Roberts and Lang told appellant he was prohibited from doing "non-job related things at work."

On September 10, 1987, Roberts sent a follow-up memorandum to appellant describing their previous meeting as involving a review of "your management of employees who are not U.S. Citizens *and* the policies and procedures that pertain to verifying the right of a newly hired person to work in the United States."

Appellant never responded to this memo, and Roberts sent another memo on October 29, 1987. The second memo stated 10 "primary functions" assigned to appellant as hospital personnel officer, including "[p]reparing paperwork for INS for employees on H-1 Visas." The memo requested appellant respond regarding the accuracy of the stated primary functions. Roberts and appellant discussed this memo one week later, and Roberts specifically informed him that his duties included the H-1 visas. Appellant agreed that the memo accurately reflected the primary functions of his office.

On March 3, 1988, Roberts sent another memo to appellant stating priority projects for his office. These included Immigration Reform and Control Act of 1986 (IRCA) verification procedures and "[m]anagement of limited work authorizations and visa status." Roberts testified the latter project included the H-1 visa transfers.

Roberts was contacted by Nurse Lucrecia Cobar toward the end of March 1988 and listened to a tape recording of a conversation between Cobar and appellant. Roberts contacted the sheriff's department and the investigation began.

Through the sheriff's investigation it was learned appellant had charged several of KMC's alien nurses and prospective nurses substantial amounts of money for immigration work. These alien nurses included Abraham

Ragudos, Jeana Rosete, Daniel Cacho, Lucrecia Cobar and Peppetua Quicho.

Ragudos went to KMC in January of 1988. Ragudos had just been fired from another hospital and was in imminent danger of being deported to the Philippines. He went to KMC and was told to see appellant.

Appellant told Ragudos he would arrange to have Ragudos's H-1 visa transferred to KMC but that it would cost $950. Appellant also said he would need the money in cash and Ragudos should tell no one about it. Ragudos gave appellant the money along with checks made out to the INS to cover the basic INS fees for H-1 visas.

Appellant also informed Ragudos that he could help bring Ragudos's dependents in the Philippines to the United States. Appellant said that this would cost $200 per dependent. Ragudos decided not to have this service.

Jeana Rosete went to see appellant in February of 1988. She wanted to get her H-1 visa transferred to KMC so that she could work there. Rosete hoped that appellant could do for her what he had done for Ragudos, who was a friend of hers.

Appellant told Rosete he would need $950 in cash in order to get her a visa transfer to KMC. He instructed her to tell no one about the arrangement. Rosete paid appellant $950 in cash and gave him checks made out to the INS to cover basic INS fees.

Appellant also told Rosete she could get her husband and two children over to the United States from the Philippines at a total cost of $600. Rosete later paid him $500 of this amount.

Daniel Cacho was sent to appellant in November of 1987. Cacho too wanted to transfer his H-1 visa from another hospital to KMC. Appellant told Cacho he would need $350 in cash to do this, as well as checks made out to the INS for the standard sums.

Appellant also told Cacho about a sixth preference visa application whereby an alien can obtain permanent residency in the United States. Appellant said it would cost an additional $450 in cash to file for such a visa, not including the standard filing fees. Cacho knew he did not need a sixth preference visa to work at KMC but felt it would eventually be to his economic advantage for him to have one. Cacho therefore paid appellant a total of $800 and told him he wished to get a sixth preference visa in addition to having his H-1 visa transferred to KMC.

Lucrecia Cobar and her family were in the United States under a grant of political asylum. In March of 1988 she went to see appellant at KMC and told him she wanted to go from her grant of asylum to an H-1 visa. She also said she wished to include her husband and four children on the petition. Appellant told Cobar it would cost her $2,800 to do this—$1,200 for herself, $800 for her husband, and $200 for each child. Cobar gave appellant a $600 downpayment and agreed to pay $550 per month until the balance was paid.

Peppetua Quicho went to see appellant in the spring of 1987 so that she could get an H-1 visa and begin working at KMC. Appellant told Quicho this would cost her $200, which would pay for working on the papers to get the visa. Quicho paid him. Shortly thereafter appellant called Quicho at home and informed her that she could not yet begin working at KMC as her Social Security card was not valid for employment. He told her it would cost her $200 to remedy this. Quicho paid appellant another $200.

A few days later appellant called Quicho again. He told her she could begin working at KMC but that there was an additional fee of $250 for getting the job. Quicho again produced the requested sum of money.

Appellant did not testify at the preliminary hearing. At trial, appellant was the only defense witness. He testified he had an immigration consulting service between 1986 and 1988 and admitted he charged the alien nurses for INS work which was beyond the scope of his hospital duties. He took the position that as part of his job he had no responsibility for processing H-1 visa, transfer of visas or permanent visas and did not prepare any of the INS paperwork relating to alien employee visas. He testified he was not responsible for hiring and firing; nor, until 1987 after the effective date of the IRCA, did he have any duties with regard to INS-related paperwork. After the IRCA, which imposed duties on employers, took effect in 1987, appellant became responsible for certain paperwork relating to immigration matters. Specifically, he was responsible for ensuring that prospective employees had both a California nurse's license and a Social Security number. Also, it was appellant's responsibility to verify that prospective employees were in fact entitled to work in the United States. To that end he would routinely inspect the immigration papers of potential employees. According to appellant, that was the extent of his duties with regard to immigration. According to his testimony, he was never required to work on H-1 visas or sixth preference visas, nor was he to fill out anything else related to immigration. He testified he was never told in writing or in person that what he was doing was wrong.

## DISCUSSION

### I.

## DID THE TRIAL COURT ERR IN DISREGARDING THE MAGISTRATE'S FINDINGS OF FACT?

At the conclusion of the preliminary hearing the magistrate stated there was not sufficient cause to believe appellant had committed grand theft and dismissed the charges. The magistrate specifically rejected the district attorney's request that he make findings of fact.

The district attorney filed a timely motion in the superior court pursuant to section 871.5[2] to compel reinstatement of the complaint.

The superior court granted the prosecution's motion to reinstate the charges. The order provided in relevant part:

"The motion to compel reinstatement of a criminal complaint is granted. Counsel for defendant concedes that, given the magistrate made no factual findings to support his conclusion there was a lack of probable cause to bind defendant over on a felony count, review of those conclusions constitutes a review of a legal, rather than a factual issue (*People vs. Slaughter* (1984) 35 Cal 3d 629).

"In this case Defendant was employed by the County of Kern as Personnel Officer at Kern Medical Center. It had been made clear to him on August 31, 1987, that the terms of his employment required that he process immigration paperwork for employees at no charge to the employee except for required INS fees. When the various victims came to Defendant for assistance, therefore, his quoting of charges to them for work he was employed by the county to perform constituted a false representation of an existing fact (i.e., that to obtain his services they must pay him for work for which the county in fact employed him).

"That the representation was made with the intent to defraud was demonstrated by proof of the admonishment given Defendant on August 31,

---

[2] Section 871.5, subdivision (a) provides:

"(a) When an action is dismissed by a magistrate pursuant to Section 859b, 861, 871, 1008, 1381, 1381.5, 1385, 1387, or 1389, or a portion thereof is dismissed pursuant to those same sections which may not be charged by information under the provisions of Section 739, the prosecutor may make a motion in the superior court within 15 days to compel the magistrate to reinstate the complaint or a portion thereof and to reinstate the custodial status of the defendant under the same terms and conditions as when the defendant last appeared before the magistrate."

1987, and by his requirement that payments be made to him in cash in an envelope and that nobody be told about it.

"Reliance (as to the completed theft counts) is demonstrated by the payment of money by the victims, who did not know the true facts (i.e., that Defendant was to assist them with immigration matters at no charge), allbeit [*sic*] they also hoped to get value from the transaction in the form of the processing of their applications.

"The fraud was successful in six instances in getting victims to part with their money . . . ."

The court also found additional acts of misrepresentation in appellant's statement to Cobar that he would use the money to hire additional immigration personnel, appellant's statement to Ragudos that the cash was necessary to hire an attorney, and his statement to Quicho that a cash payment was necessary for obtaining her job at KMC.

The order concluded as follows:

"The magistrate is ordered to issue an order of commitment on [the dismissed counts] within 10 days of the date of this order unless defendant elects, pursuant to provisions of PC § 871.5 to waive his right to such an order and to proceed with the filing of an information in Superior Court. [¶] Defendant shall appear on this matter in Municipal Court before the committing magistrate on October 21, 1988 for further proceedings consistent with this order."

The matter was returned to the municipal court pursuant to the superior court's order. Pursuant to the superior court's order, the magistrate reinstated the charges and held appellant to answer as directed by the order of the superior court, but specifically refused to say there was sufficient cause to do so. At the request of defense counsel and over the objections of the district attorney, the magistrate made express findings of fact in answer to 25 questions submitted by defense counsel. The findings conflicted in substantial part with those of the superior court. The magistrate's findings determined that appellant was not obligated to obtain any personal documentation for KMC employees or file any forms on behalf of dependents as part of the KMC job. His KMC duties did not include application for the sixth preference visa. The court also found that nurses accepted appellant's offer for INS work on their behalf which was not within the terms of his employment. The magistrate concluded that appellant was only required to process H-1 visa transfers as part of his employment.

Thereafter, appellant timely moved in the superior court to dismiss the charges pursuant to section 995 based on the magistrate's findings, arguing that the magistrate had authority to make the findings pursuant to section 871.5, subdivision (e)[3] directing the magistrate to "resume the proceedings" after the superior court's order of reinstatement. The superior court treated the magistrate's findings as surplusage and denied the motion to dismiss.

Appellant contends the superior court erred by (1) making factual findings in his order of reinstatement; (2) rejecting the magistrate's findings as surplusage; and (3) failing to consider the magistrate's factual findings in reviewing the section 995 motion.

■ When an action has been dismissed by the magistrate, section 871.5 allows the prosecution to seek review in the superior court and request reinstatement of the charges "under the same terms and conditions as when the defendant last appeared before the magistrate." (§ 871.5, subd. (a), see fn. 2, *ante*; *People* v. *Dianda* (1986) 178 Cal.App.3d 174, 176-177 [223 Cal.Rptr. 635].) The prosecution may move for reinstatement under this section, however, only on the basis that "as a matter of law, the magistrate erroneously dismissed the action or a portion thereof." (§ 871.5, subd. (b); *People* v. *Luna* (1983) 140 Cal.App.3d 788, 792 [189 Cal.Rptr. 792].) The motion to reinstate is not limited to situations in which the charges have been dismissed for lack of probable cause. The superior court may review the dismissal of a complaint based upon a ruling on legal grounds on any motion properly before and decided by the magistrate. This includes, for example, dismissals following a successful suppression motion. (*Vlick* v. *Superior Court* (1982) 128 Cal.App.3d 992, 999 [180 Cal.Rptr. 742]; *Dunn* v. *Superior Court* (1984) 159 Cal.App.3d 1110, 1117 [206 Cal.Rptr. 242]; *People* v. *Mayo* (1986) 185 Cal.App.3d 389, 394 [229 Cal.Rptr. 762].)

The superior court's review of a magistrate's dismissal for lack of sufficient cause under this section depends on the existence of factual findings. If the magistrate made express factual findings and dismissed the charges for lack of probable cause, the superior court is bound by those findings if supported by substantial evidence. If the magistrate dismissed the charges without making factual findings, the superior court reviews the dismissal as a question of law. (*People* v. *Slaughter* (1984) 35 Cal.3d 629, 638-642 [200 Cal.Rptr. 448, 677 P.2d 854].) The magistrate's order is re-

---

[3] Section 871.5, subdivision (e) provides:

"(e) When a court has ordered the resumption of proceedings before the magistrate, the magistrate shall resume the proceedings and when so ordered, issue an order of commitment for the reinstated offense or offenses within 10 days after the superior court has entered an order to that effect or within 10 days after the remittitur is filed in the superior court. Upon receipt of the remittitur, the superior court shall forward a copy to the magistrate."

viewed to determine whether as a matter of law the evidentiary record discloses a rational basis for believing the defendant guilty of the charged offense. (*People* v. *Slaughter, supra,* 35 Cal.3d at pp. 642-643.) The superior court shall determine the motion based on the record of the preliminary hearing. (§ 871.5, subd. (c).)

If the superior court determines that the magistrate's dismissal of the complaint was erroneous as a matter of the law, it may order the reinstatement of the charges. (§ 871.5, subd. (e).)

Appellant first contends that Judge Randall's reinstatement order improperly included findings of fact. This is refuted by the record. Based on the absence of factual findings, the superior court was entitled to determine whether the dismissal of charges was erroneous as a matter of law. Judge Randall briefly summarized the uncontroverted preliminary hearing evidence and determined as a matter of law the evidence was sufficient to constitute probable cause to believe appellant was guilty of grand theft by false pretenses, that is "such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609].)

As stated in *People* v. *Slaughter, supra,* 35 Cal.3d at pages 639-640, "Absent controlling factual findings, if the magistrate dismisses a charge when the evidence provides a rational ground for believing that defendant is guilty of the offense, his ruling is erroneous *as a matter of law,* and will not be sustained by the reviewing court."

Contrary to appellant's contention, the record does not reflect the superior court assessed the credibility of the witnesses or resolved conflicts in the evidence. The order only reflects the superior court's determination that the evidence provided a rational basis for believing that appellant is guilty of the offense charged.

■ Appellant next contends the magistrate was entitled to render factual findings following the superior court's order of reinstatement. He also contends the superior court was bound by those findings when it reviewed the section 995 motion. Appellant relies on section 871.5, subdivision (e), which directs the magistrate to "resume the proceedings" after the superior court has ordered reinstatement of the charges. Appellant contends that "[i]f the magistrate's sole job, upon being told to hold the defendant to

answer, were to issue an order of commitment, the words 'resume the proceedings' would be unnecessary verbiage."

Appellant relies on *Chism* v. *Superior Court* (1981) 123 Cal.App.3d 1053 [176 Cal.Rptr. 909]. In *Chism*, the court addressed the magistrate's power to "resume the proceedings." Defendant claimed his Fifth and Sixth Amendment rights had been violated and filed a motion to dismiss at the preliminary hearing. The motion was granted at the conclusion of the evidence. In granting the motion, the magistrate also indicated he would have dismissed the complaint regardless of the defense motion, but failed to make an express finding on probable cause. The prosecution moved for reinstatement pursuant to section 871.5. The superior court reviewed the preliminary hearing transcript and determined that sufficient cause existed to hold defendant to answer. The superior court declined to return the matter to the magistrate, held defendant to answer, and proceeded with the arraignment. (*Id.* at p. 1058.)

On appeal, the court noted that the magistrate's dismissal of charges was based on defendant's due process motion, and the magistrate never made a definitive ruling on probable cause. While the superior court was entitled to reinstate the charges pursuant to section 871.5, it improperly made a probable cause determination and arraigned the defendant without returning the matter to the magistrate. (123 Cal.App.3d at p. 1062.) Section 871.5, subdivision (e) directs the superior court to return the matter to the magistrate to "resume the proceedings" after reinstatement is ordered:

"The only reasonable interpretation of this language is that upon granting of a motion under section 871.5, the superior court must return the action to the municipal court with directions that the complaint be reinstated in that court by the magistrate and that the magistrate is to resume the proceedings *at the point they were previously terminated by dismissal.* Nothing in section 871.5 suggests the superior court may, after finding the magistrate erroneously dismissed the complaint, conduct all remaining municipal court proceedings otherwise within the exclusive jurisdiction of the magistrate." (*Chism* v. *Superior Court, supra*, 123 Cal.App.3d at p. 1060, italics added.) The arraignment was vacated because superior court's probable cause finding was premature and exceeded the scope of its authority under section 871.5. The superior court was ordered to return the matter to the magistrate "to resume those proceedings at the point he dismissed the complaint . . . and exercise the discretion in those proceedings conferred to him by law." (123 Cal.App.3d at p. 1062.)

It is clear the prosecution may move for reinstatement pursuant to section 871.5 if the magistrate has dismissed charges on any legal ground. (*Vlick* v. *Superior Court, supra,* 128 Cal.App.3d at p. 999.) This does not restrict the reinstatement motion merely to dismissals based on lack of probable cause. Appellant's reliance on *Chism* is misplaced because it is an example of the necessity of the magistrate to resume the proceedings if he never reached the issue of probable cause. The charges had been dismissed based on a due process motion, and the magistrate never determined whether probable cause existed to hold the defendant to answer. The magistrate was directed to resume the proceedings at the point they had been terminated by the dismissal: the determination of whether sufficient cause existed to hold defendant to answer. The magistrate would have been entitled to make factual findings in making the determination of sufficient cause.

The prosecution may also seek reinstatement pursuant to section 871.5 if the magistrate grants a suppression motion and dismisses charges. (*People* v. *Luna, supra,* 140 Cal.App.3d at p. 794; § 1538.5, subd. (j).) In such a case, the preliminary hearing might have been limited to evidence concerning the suppression motion, and the magistrate again would resume the proceedings at the point terminated by the dismissal: introduction of evidence regarding the offense in order to determine if sufficient cause exists to hold the defendant to answer. The magistrate would be entitled, but not required, to make factual findings to assist in the determination of probable cause.

In the instant case, the magistrate heard all the evidence and any argument apparently occurred off the record. The magistrate declined to make factual findings and expressly dismissed charges for lack of probable cause. The magistrate's power to make factual findings exists to assist in the determination of sufficient cause. (*People* v. *Slaughter, supra,* 35 Cal.3d at pp. 637-638.) After the superior court determined the dismissal was erroneous as a matter of law and ordered reinstatement, there was nothing left for the magistrate to do but hold the defendant to answer. There was no purpose for the factual findings since the probable cause determination had already been made by the magistrate and reversed by the superior court. The magistrate did not have the power to render such findings, and the superior court was entitled to disregard the findings when reviewing the section 995 motion.

Appellant relies on *People* v. *McGlothen* (1987) 190 Cal.App.3d 1005, 1009 [235 Cal.Rptr. 745], for the contention that the magistrate may automatically make factual findings following an order of reinstatement. In

*McGlothen*, defendants were charged with attempted murder for several drive-by shootings. The magistrate dismissed the charges following the preliminary hearing and noted the color discrepancy between the vehicle described by an eyewitness and the vehicle driven by defendants. The prosecution moved for reinstatement pursuant to section 871.5. The superior court granted the motion and ordered the magistrate to " 'hear any evidence sought to be presented . . . and to make such orders as you deem suitable at the conclusion of the proceedings, including, if no additional evidence is offered, and you make no adverse findings of fact, an order of commitment holding defendants to answer to the reinstated offenses.' " (*Id.* at p. 1010.) A second preliminary hearing was held but no further evidence was presented. The magistrate again concluded there was a lack of probable cause and dismissed the complaint. The magistrate issued an extensive statement of decision which determined that the eyewitnesses were credible but relied on a "calculation of probability" of only " '3.3 %' " that defendants were involved in the shooting based on the color discrepancy between the vehicles. (*Id.* at pp. 1010, 1013.) The prosecution again sought reinstatement, but the superior court denied the motion because of the magistrate's factual findings.

On appeal, the court determined that the magistrate's dismissal of charges was erroneous as a matter of law. The eyewitness testimony, which the magistrate accepted as credible, supported the inference the defendants were guilty of attempted murder. In addition, the magistrate's "calculation of probability" was "neither finding nor fact." (190 Cal.App.3d at p. 1013.) "In dismissing the complaint the magistrate came to the legal conclusion that the evidence was insufficient to find probable cause. This ruling was error as a matter of law and not entitled to the deference given to it by the superior court." (*Id.* at p. 1015.)

*McGlothen* differs from the instant case in that the superior court specifically directed the magistrate to hold the defendant to answer or make adverse factual findings. In addition, there were no "factual findings" for the superior court to rely upon because of the magistrate's bizarre mathematical determination of insufficient cause.

Appellant contends the magistrate "must be given the opportunity to make factual findings" following the superior court's order of reinstatement. It is the magistrate, however, who is empowered to make factual findings and determine the existence of probable cause in the first instance at the preliminary hearing. If he declines the opportunity, the superior court determines whether the defendant should be held to answer as a matter of

law. The matter is then returned to the magistrate to hold the defendant to answer. The instant case presents an example of the preliminary hearing proceeding so far that there is nothing left for the magistrate to do but "resume the proceedings" and hold the defendant to answer. The magistrate's belated attempt to insert factual findings served to undermine the superior court's legal ruling. The superior court properly addressed the section 995 motion without regard to factual findings which the magistrate was not authorized to render.

II-VI, PART B*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

The judgments are affirmed.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.

A petition for a rehearing was denied February 5, 1991, and appellant's petition for review by the Supreme Court was denied March 27, 1991.

---

*See footnote, *ante*, page 1397.