Filed 2/20/25  P. v. Quiros CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>RODNEY GERARDO QUIROS, JR.,<br><br>Defendant and Respondent. | F087893<br><br>(Super. Ct. No. CR-19-005786)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy Leo and Dawna F. Reeves, Judges.*

Jeff Laugero, District Attorney, and Amy Elliott Neumann, Deputy District Attorney, for Plaintiff and Appellant.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

---

* Judge Leo, acting as magistrate, presided over the May 30, 2023, preliminary examination hearing.  Judge Reeves presided over the February 14, 2024, hearing on respondent's Penal Code section 995 motion.

# INTRODUCTION

In 2019, respondent Rodney Gerardo Quiros, Jr., was a passenger in an allegedly stolen vehicle, and respondent's codefendant, Antonio Marin Gazo, was the driver. Gazo led law enforcement on a high-speed chase in and outside the city limits of Modesto. During the chase, respondent fired four separate volleys of shots at law enforcement personnel. The chase ended in a crash after law enforcement deployed a spike strip. Gazo and respondent's vehicle struck two bystanders, killing them.

In relevant part, the prosecution charged Gazo and respondent in two counts of murder (counts I and II). Following the preliminary hearing, the magistrate only held Gazo to answer the murder charges.[1] The prosecution filed an information which again charged both Gazo and respondent with murder (counts I and II). Respondent filed a motion in the trial court pursuant to Penal Code section 995[2] (the 995 motion), asking the court to set aside counts I and II as to him. The court granted the 995 motion.

Appellant is the People of the State of California, represented by the district attorney. Appellant argues that the magistrate erred in failing to hold respondent to answer for the murder charges. We agree. Respondent aided and abetted Gazo in his driving conduct, which was the cause of these deaths. There was evidence that suggests the driving conduct carried with it a high degree of probability that death would result. In light of the low standard necessary to hold a defendant to answer criminal charges, we conclude that respondent can be held to answer for the alleged murders of the two victims. We will remand this matter for further proceedings.

---

[1] Respondent was held to answer various felony charges, including four counts of attempted murder of peace officers (counts III, IV, V and VI).

[2] All future statutory references are to the Penal Code unless otherwise noted.

# BACKGROUND

We summarize the material facts from the preliminary hearing. These facts have not been established beyond a reasonable doubt.

## I. The High Speed Chase.

On June 15, 2019, Gazo and respondent led law enforcement on a high-speed chase. The chase started at about 1:40 a.m. in the City of Modesto. Gazo was driving a vehicle which had been reported stolen. Respondent was in the front passenger seat.

A police officer activated his emergency lights and siren and attempted to initiate a traffic stop. Gazo sped away, reaching speeds of around 100 miles per hour. The officer pursued. Gazo drove outside the city limits while maintaining the same speed. There were no pedestrians or street traffic at that time.

While outside the city limits, Gazo slowed the vehicle to about 65 miles per hour. Respondent leaned his torso outside the passenger window, and he fired five shots in the direction of the pursuing officer. Fearing for his safety, the officer slowed down and pursued from a farther distance. After the shots were fired, Gazo again accelerated to about 100 miles per hour.

While pursuing, the officer heard additional gunshots, about three to five, when Gazo navigated a turn. While making that turn, Gazo slowed down. After the second volley of shots, Gazo again accelerated to about 100 miles per hour. Gazo ran through a controlled intersection without stopping. The pursuing officer saw the suspects turn the vehicle's lights off and on about three times. In the officer's opinion, the suspects were turning off their lights to avoid capture. Around that time, the pursuit was occurring on a country road that was very dark.

At another intersection, Gazo slowed the vehicle down to about 75 or 85 miles per hour. The pursuing officer heard three to five gunshots.

3.

During one volley of shots, a police officer was on the shoulder of the road. The suspects drove past him at 80 to 90 miles per hour, if not faster. This officer heard three to four gunshots as the suspects' vehicle drove past him. The officer ducked behind his door for protection.[3]

In total, the evidence from the preliminary hearing demonstrates that respondent discharged a firearm at officers on four separate occasions. After the final volley of shots, Gazo drove the vehicle back towards the city limits. Gazo was traveling well above the legal speed limit, going around 100 to 110 miles per hour. Gazo ran through controlled intersections without stopping.

A sheriff's detective participated in the chase. The detective testified that the suspects' vehicle went through "multiple stoplights." At that time, there was a "little bit" of street traffic. The detective told the magistrate that he slowed down at intersections to wait for motorists to get out of the way. He was traveling at about 80 or 90 miles per hour, but the suspects were going 30 or 40 miles an hour (or more) faster. The detective observed that the suspects were not stopping at red lights or slowing down for other motorists.

Inside the city limits, law enforcement deployed a spike strip, which Gazo ran over. The spike strip was deployed just before Gazo entered a curved section of roadway. After contacting the spike strip, Gazo lost control of the vehicle.[4] He ran off of the roadway and the vehicle jumped a curve. It crashed into the "eating area" near a taco truck. The vehicle struck two bystanders, Pedro Gil and Melchor Fong Leyva.[5] As a

---

[3]    The prosecutor charged Gazo and respondent with four counts of attempted murder of a peace officer (counts III, IV, V, and VI).

[4]    This record does not detail how far Gazo drove after running over the spike strip before he lost control of the vehicle.

[5]    At times, the reporter's transcript spells Melchor's full name as "Melchor Leyva Fong." The charging documents alleged Melchor's full name as "MELCHOR

result of this collision, Gil and Leyva suffered extensive blunt force trauma. They were pinned under the vehicle, and they were pronounced dead at the scene.

Gazo and respondent fled on foot from the crashed vehicle. A short time later, law enforcement located them, and they were taken into custody.[6] Law enforcement discovered two firearms inside the stolen vehicle. One firearm was empty, but another had a magazine that still had rounds in it.

## II. The Suspect's Statements.

After being taken into custody, respondent telephoned his mother. He told her he had done "something bad. Very serious." He told his mother something like "not to worry about it because he could do the time."

Gazo agreed to speak with law enforcement officials. He admitted that he had been driving the vehicle. He estimated that he was traveling at around 80 to 100 miles per hour. Gazo recalled that, at one point, he leaned his seat back during the chase. According to Gazo, respondent reached over him, and respondent fired a gun out of the driver's side window. Gazo estimated that, at that point, he was driving anywhere from 80 to 100 miles per hour.

Gazo told officials that someone "threw a belt" or something like that towards his vehicle, which caused him to lose control. Gazo reported to authorities that he was unable to stop the vehicle, and he never intended for the collision to occur. Gazo claimed to law enforcement that he had tried to brake and turn the car, but the car was not working properly. Gazo claimed that this is what caused the crash.

---

LEYVAFONG." For this opinion, we adopt the name for Melchor which the pathologist used at the preliminary hearing—"Melchor Fong Leyva."

[6] When respondent's sweatshirt was collected from him, a spent shell casing fell from its pocket. When taken into custody, respondent was wearing an empty gun holster strapped around his torso.

Gazo reported that he had been intoxicated with alcohol and Xanax when these events occurred.[7] He claimed he did not realize law enforcement was pursuing him, but, instead, "people" were following and chasing him. Gazo said that, during the pursuit, he thought someone was shooting at them or trying to kill them. Gazo stated that, after crashing, he attempted to retrieve "a couple firearms" from the vehicle "because he wanted the situation to stop."

During his interview with officials, Gazo asked why officers had not shot him. Gazo stated that he had wanted to be shot.

### III.  The Cause of the Fatal Collision.

A sergeant with the Modesto Police Department investigated the cause of this collision. The sergeant opined at the preliminary hearing that the suspects' vehicle was traveling about 96 miles per hour about five seconds before the fatal collision. According to the sergeant, the suspects' vehicle was traveling at about 50 miles per hour when the collision occurred. In contrast, a deputy observing the chase from a helicopter opined at the preliminary hearing that the suspects' vehicle was traveling about 80 miles per hour at the time of the crash. The speed limit at the accident scene was about 35 miles per hour.

The investigating sergeant found that the suspects' front driver's side tire was deflated, and it had hollow quills in it. The quills were consistent with a spike strip. According to the sergeant, this could have contributed to the fatal collision.

At the preliminary hearing, the sergeant emphasized that the main cause of this fatal collision was "unsafe speed." The sergeant also noted that the suspects had violated Vehicle Code section 22107 because they had traveled off the roadway. The sergeant wrote in his report that the deflated tire was a "defect" that also contributed to this collision.

---

[7]     The detective who interviewed Gazo testified at the preliminary hearing that Gazo had not appeared intoxicated that day.

The sergeant acknowledged at the preliminary hearing that law enforcement had "probably not" deployed the spike strip in the best location because it was deployed just before an intersection that had a curve. However, the sergeant opined in court that this collision would have nevertheless occurred even without a spike strip based on the speed of the suspects' vehicle and the curve it was encountering.

## IV.    The Magistrate Declines to Hold Respondent to Answer for Murder.

In relevant part, the prosecution charged Gazo and respondent with murder for the deaths of Gil and Leyva (counts I and II). At the conclusion of the preliminary hearing, the prosecutor argued that respondent had intended to aid and assist Gazo in evading capture, which caused these deaths. The prosecutor emphasized that both defendants had worked together. The prosecutor asked the magistrate to hold both defendants to answer for murder.

The magistrate stated: "I don't know how [respondent] can be held responsible for what the driver of the vehicle was doing. Obviously [respondent's] life was in danger as much as anybody else's was at the hands of [Gazo] behind the wheel. [¶] So I don't believe there's sufficient evidence for a holding order … for [respondent] in [counts] I and II." (RT Aug. 162)

The magistrate held Gazo to answer for the murders charged in counts I and II. Both defendants were held to answer in four counts of attempted murder of peace officers (counts III, IV, V and VI). Gazo was held to answer for evading a police officer (count VII); evading a peace officer causing death (count VIII); and felony hit and run causing death (count IX). Gazo and respondent were both held to answer for possession of firearms and ammunition as felons (counts X, XI, XII, & XIII). Finally, Gazo was held to answer for unauthorized use of a vehicle (count XIV).

## V. The Trial Court Grants Respondent's Motion to Dismiss these Murder Charges.

Despite the magistrate's ruling, the prosecution filed an information again alleging that both defendants had committed murder in counts I and II. Respondent filed the 995 motion. Respondent asked the trial court to set aside the information as to counts I and II.

The prosecutor filed a written opposition. The prosecutor contended that, after the magistrate had issued its ruling, the California Supreme Court published *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*), which articulated when a defendant may be liable for murder as a direct aider and abettor to implied malice murder. (*Id.* at p. 992 ["implied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator, such as shooting at the victim"].) The prosecutor argued that sufficient evidence supported the murder charges against respondent in counts I and II.

In February 2024, the trial court conducted a hearing to resolve the 995 motion. The prosecutor argued that the "act" which caused the deaths of Gil and Leyva was not just Gazo's speeding, but the "evading" of both defendants. In contrast, respondent asserted that the deadly act was speeding, plus the spike strip that law enforcement had placed. Respondent's counsel maintained that nothing from the preliminary hearing established that respondent had aided and abetted Gazo's speeding.

The trial court concluded that the fatal act was caused by "excessive speed" along with "other factors that contributed" to Gazo's "loss of control" of the vehicle. According to the court, there was no evidence from the preliminary hearing that suggested respondent had acted with a conscious disregard for human life relative to the speeding. Respondent had fired at pursuing officers, and his actions resulted in charges filed against him for attempted murder. However, the court found that respondent's conduct had not contributed to the speed of the vehicle. The court stated that respondent

8.

may have aided and abetted getting away, but the fatal act was speeding, which respondent had not aided and abetted.

The trial court concluded that the magistrate had not made any factual findings when it previously ruled against the prosecution. The trial court stated that it agreed with the magistrate's view of this case. According to the court, respondent was required to contribute to the fatal act, and not just to the overall crime. The court granted the 995 motion.

## VI. The Writ and Appeal Filed in this Court.

In April 2024, appellant filed in this court a petition for writ of mandate and/or prohibition and alternate writ of supersedeas to stay the trial (the writ). The writ was filed in appellate case number F087873. The writ asked this court to issue a peremptory writ of prohibition and/or mandate, directing the superior court to rescind its order dismissing the murder charges against respondent and to reinstate those charges against him. In addition, appellant asked this court to issue a writ of supersedeas staying the lower court action until the matter can be reviewed by writ or appeal.

In September 2024, appellant filed the present appeal in this court in appellate case number F087893. The appeal asks this court to reverse the superior court's order dismissing the murder charges against respondent and to direct the trial court to reinstate those charges.[8] We turn to the merits of this appeal.

## DISCUSSION

## I. The Standard of Review.

The parties agree that the magistrate made no findings of fact when it ruled that respondent could not be held to answer for the murders charged in counts I and II. The parties also agree that we must independently review the preliminary hearing transcript to

---

[8] The substantive issues raised in the writ were identical with the issues in this appeal. As such, this court denied the writ without prejudice pending the disposition in this matter.

determine whether respondent may be held to answer for murder. We agree with the parties on both points.

Because the magistrate did not make any findings of fact, but, instead, reached a legal conclusion, we review the magistrate's decision as a question of law. (*People v. Childs* (1991) 226 Cal.App.3d 1397, 1406; see also *People v. Slaughter* (1984) 35 Cal.3d 629, 638 ["A dismissal unsupported by findings therefore receives the independent scrutiny appropriate for review of questions of law"].) We disregard the resolution of the 995 motion, and, instead, we focus on the magistrate's ruling. (*People v. Woods* (1993) 12 Cal.App.4th 1139, 1147.)

The question before us is whether the preliminary hearing evidence discloses a rational basis for believing respondent is guilty of murder in Gil's and Leyva's deaths. (See *People v. Childs, supra*, at pp. 1406–1407; *People v. Slaughter, supra*, 35 Cal.3d at pp. 638–642.) If so, then respondent must be held to answer for those charges.

## II.     We Reverse the Magistrate's Ruling and Remand for Further Proceedings.

Appellant asserts that, because respondent fired multiple times at the officers, a reasonable inference may be drawn that respondent aided and abetted Gazo in evading capture, which caused these deaths. As such, appellant argues respondent should be held to answer for murder. In contrast, respondent contends we should affirm the magistrate's ruling. According to respondent, no evidence was introduced to show that either Gazo or respondent intended to commit an act with the knowledge it entailed a "high probability" that death would result.

### A.     *The standard to hold a defendant to answer criminal charges.*

The standard to hold a defendant to answer criminal charges is "exceedingly low." (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846; *People v. Abelino* (2021) 62 Cal.App.5th 563, 573 [accord].) The evidence necessary to justify a prosecution is less than what is required to convict. (*People v. Scully* (2021) 11 Cal.5th 542, 582; *Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.) "To establish probable cause

sufficient to withstand a section 871 or section 995 motion to dismiss, the People must make some showing as to the existence of each element of the charged offense. [Citations.]" (*Thompson v. Superior Court* (2001) 91 Cal.App.4th 144, 148.)

To hold a defendant to answer criminal charges, it need only be shown at the preliminary hearing that a "strong suspicion" exists that would cause a person of "ordinary caution or prudence" to believe the accused is guilty. (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667; see also *People v. Slaughter, supra,* 35 Cal.3d at p. 636 [accord].) This standard does not require proof beyond a reasonable doubt, or even proof by a preponderance of the evidence. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1189.)

"We will not set aside an information 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654, quoting *People v. Hall* (1971) 3 Cal.3d 992, 996.) "[A]n indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged." (*People v. Superior Court* (*Jurado*) (1992) 4 Cal.App.4th 1217, 1226.)

**B.      *The elements for implied malice murder as an aider and abettor.***

Murder requires malice aforethought, which is either express or implied. Express malice is an intent to kill, which can be exhibited as "a deliberate intention to unlawfully take away the life of a fellow creature." (§§ 187, subd. (a); 188, subd. (a)(1).)

Implied malice occurs when a person (1) intentionally engaged in an act; (2) the natural and probable consequences of that act involved a high degree of probability that it would result in death; (3) at the time the person acted, they knew the act entailed that danger; and (4) the person acted with conscious disregard for life. (CALCRIM No. 520.)

In June 2023, our high court issued *Reyes*. In *Reyes*, a unanimous court clarified and held that implied malice murder required more than an act that was dangerous to life in some vague or speculative sense; instead, it must involve " ' "a high degree of probability that it will result in death." ' " (*Reyes, supra,* 14 Cal.5th at p. 989.)

11.

Malice may not be imputed to a person based solely on his participation in a crime.  (§ 188, subd. (a)(3).)  An aider and abettor cannot be found guilty of murder based on the natural and probable consequences doctrine. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 950.)  However, aiders and abettors may be convicted of murder under a theory of implied malice.  (*People v. Curiel* (2023) 15 Cal.5th 433, 466.)  It is this theory that appellant is using to hold respondent to answer for murder.

An aider and abettor may be liable for implied malice murder if he aids in the commission of the life-endangering act.  The defendant must know the perpetrator intended to commit the life-endangering act.  It must be shown that the defendant intended to aid the perpetrator in the commission of that act, the defendant knew that act is dangerous to human life, and the defendant acted in conscious disregard for human life. (CALCRIM No. 526.)  "An act is *dangerous to human life* if there is a high degree of probability that the act will result in death."  (*Ibid.*)

### C.     *Glukhoy.*

Appellant relies on *People v. Glukhoy* (2022) 77 Cal.App.5th 576 (*Glukhoy*).  In *Glukhoy*, twin brothers led police on a high-speed chase in a stolen truck.  The chase ended in a fatal collision that killed two people.  Separate juries found the defendants guilty of multiple offenses and allegations.  (*Id*. at pp. 579-580.)  On appeal, the *Glukhoy* court affirmed the murder conviction for the brother who was the passenger during the fatal crash.  The court found that the passenger's "culpability as a direct aider and abettor of implied malice murder" was "overwhelming."  (*Id.* at p. 599.)

The *Glukhoy* court held that the driver's reckless driving was the "life-endangering act" that caused the death of the victims.  (*Glukhoy, supra,* 77 Cal.App.5th at p. 600.)  When the fatal accident occurred, the brothers' stolen vehicle was traveling on surface streets well in excess of the speed limit.  (*Ibid*.)  Before the fatal collision occurred, the passenger had directed his brother to "get off the freeway" at a particular exit "because

they knew the area." (*Ibid*.)  The appellate court held that this evidence "conclusively" satisfied "the actus reus requirement" for aider and abettor liability.  (*Ibid*.)

The *Glukhoy* court concluded that the passenger had never told his brother to stop his reckless and dangerous driving.  (*Glukhoy, supra,* 77 Cal.App.5th at p. 599.)  The appellate court held that the passenger had known that his brother's driving conduct was dangerous to human life, but the passenger had aided and abetted that dangerous conduct by directing him where to go.  (*Id.* at p. 601.)  The passenger "knew the area," which meant that "he had to have known" the street where the fatal accident occurred "was a surface street with traffic lights controlling major intersections."  (*Id.* at p. 602.)  The passenger admitted to investigators that he knew it was dangerous to speed and evade the police.  (*Ibid*.)  The passenger gave a false statement to officials, claiming they were traveling much slower than the 93 miles per hour that was recorded on the air bag module.  (*Ibid*.)  The appellate court noted that the passenger's false statement evinced his consciousness of guilt, which was "another circumstance tending to prove aiding and abetting."  (*Ibid*.)  The passenger's "false statement as to speed" demonstrated he "personally appreciated the risk of death posed by his brother's excessive speed and tried to downplay it by claiming they were not going as fast as they were."  (*Ibid*.)

Finally, the appellate court noted that the brothers' conduct after the fatal collision showed "their disregard for the risk their conduct presented to human life."  (*Glukhoy, supra,* 77 Cal.App.5th at p. 602.)  After colliding into the victims' car at a high rate of speed and pushing it an estimated 45 yards, the two brothers "fled from the scene without checking on the occupants of the [victims' car].  This conduct was consistent with the prosecutor's closing argument theme: [the brothers] did not care whether they endangered or hurt anyone during the flight from law enforcement."  (*Ibid*.)

13.

**D.** ***Appellant established the requirements to hold respondent to answer for implied malice murder as an aider and abettor.***

The preliminary hearing in this matter commenced on May 30, 2023, and it concluded the following day. This preliminary hearing took place just before our high court published *Reyes* in June 2023. In *Reyes*, a unanimous court clarified and held that, "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Reyes, supra,* 14 Cal.5th at p. 989.)

In his brief in this court, respondent concedes that Gazo's speeding was dangerous. However, respondent argues that the speeding or evading does not necessarily mean there was a high probability death would result. Respondent notes that the roadways were "essentially deserted" when this chase occurred in the middle of the night. There were no pedestrians or cyclists present. Gazo did not swerve or lose control until after the spike strip was deployed. Respondent emphasizes that he and Gazo were relatively young when these crimes occurred,[9] which he contends should be considered when evaluating the elements of implied malice. Respondent argues that Gazo's driving "reflects the reasoning of an immature brain."

Respondent notes that the parties and the magistrate never addressed below whether a high probability of death was created stemming from Gazo's driving. Respondent argues that the spike strip was an "unusual" intervening factor that contributed to this fatal accident. In light of the heightened requirements articulated in *Reyes*, respondent contends that we should affirm the dismissal of the murder charges against him in counts I and II.

---

[9]     Respondent was about 24 years old when these crimes occurred. Gazo was about 22 years old.

14.

### 1. Justice Evans's recent comments in *Doaifi.*

Justice Evans on our high court recently commented on the heightened standard articulated in *Reyes*. In *People v. Doaifi* (Oct. 16, 2024, No. S286155) ___Cal.5th___ [2024 Cal. LEXIS 5774], the high court denied a petition for review in which a defendant was convicted of murder stemming from a vehicular homicide. Justice Evans wrote a concurring statement, which was joined by Justice Liu.

Justice Evans noted that, "in vehicular homicide cases, murder liability may be the appropriate sentence." (*People v. Doaifi, supra,* ___Cal.5th___ [2024 Cal. LEXIS 5774, at *11], (conc. statement Evans, J.).) However, Justice Evans cautioned that such cases "present difficult questions." (*Ibid*.) Although speeding is dangerous, and reckless speeding even more so, speeding by itself, even at a high rate of speed, does not automatically mean death will result to a high degree of probability. (*Ibid*.) "Rather, an objective analysis of the risk of speeding must account for a myriad of factors. Speeding on a highway differs from speeding in a residential neighborhood; traveling 100 miles per hour in a 45-mile-per-hour zone is not the same as doing so in a 70-mile-per-hour zone. Other factors such as the time of day, visibility, traffic volume, weather, and road conditions can all be relevant. Expert testimony on traffic fatalities may be needed to objectively establish a 'high degree of probability' of causing death that adequately accounts for various risk factors." (*Ibid*.) Justice Evans wrote, "It is impermissible to equate a speculative 'risk' to human life with an act demonstrating a ' " 'high degree of probability that death will result.' " ' (*People v. Doaifi, supra,* ___Cal.5th___ [2024 Cal. LEXIS 5774, at *12], (conc. statement Evans, J.), quoting *Reyes, supra*, 14 Cal.5th at p. 989.)

### 2. The evidence from the preliminary hearing is sufficient to hold respondent to answer the charges in counts I and II.

We are mindful that, following *Reyes*, implied malice murder requires the defendant's act to not merely be dangerous to life in some vague or speculative sense;

15.

instead, there must be a high degree of probability death will result. (*Reyes, supra,* 14 Cal.5th at p. 989.) However, in resolving the present claim, we are also mindful of the " 'exceedingly low' " standard that exists to hold a defendant to answer criminal charges. (*People v. Abelino, supra,* 62 Cal.App.5th at p. 573; *Salazar v. Superior Court, supra,* 83 Cal.App.4th at p. 846 [accord].)

With this very low standard in mind, we conclude that the preliminary evidence has established probable cause to assume the possibility respondent is guilty of implied malice murder as an aider and abettor. Some evidence exists from which a reasonable inference may be drawn that Gazo's driving created a high degree of probability that death would result.

The defendants led law enforcement on a fairly lengthy high-speed chase. Gazo drove consistently at speeds at or over 100 miles per hour, both inside and outside the city limits. The defendants turned off the vehicle's lights on a dark country road. The defendants worked together to fire repeatedly at law enforcement personnel. Gazo ran through controlled intersections without stopping or slowing. Although traffic was light, there were other motorists on the road, and a pursuing detective slowed down at intersections to wait for motorists to get out of the way. The detective was pursuing at about 80 or 90 miles per hour, but the suspects were going 30 or 40 miles an hour (or more) faster. The detective observed that the suspects were not stopping at red lights or slowing down for other motorists.

The speed limit was only about 35 miles per hour where this fatal crash occurred. The defendants, however, were traveling anywhere from 80 to 96 miles per hour just before they went off the road.

At the preliminary hearing, the investigating sergeant acknowledged that law enforcement had "probably not" used the spike strip in the best location because it was deployed just before an intersection that had a curve. However, the sergeant opined in

16.

court that this collision would have nevertheless occurred even without a spike strip based on the speed of the suspects' vehicle and the curve it was encountering.

The evidence from this preliminary hearing amply demonstrates that human lives were put in danger based on the natural and probable consequences of Gazo's driving. (CALCRIM No. 520.)  It was Gazo's "driving conduct" that proximately caused the death of the victims.  (See *Glukhoy, supra,* 77 Cal.App.5th at p. 600 [reaching similar finding];[10] see also CALCRIM No. 520 [an act "causes death if the death is the direct, natural, and probable consequence" of the act, "and the death would not have happened without" the act.].)

The question, therefore, is whether respondent aided and abetted in the life-endangering act.  The record from this preliminary hearing amply answers that question in the affirmative.

On four different occasions, respondent fired separate volleys of shots at officers. At times, Gazo slowed the vehicle when respondent fired.  After shots were fired, Gazo would again accelerate to unsafe speeds.  Gazo admitted to law enforcement that, on one occasion, he leaned his driver's seat back so that respondent could fire across him out of the driver's side window.  Gazo estimated that, at that point, he was driving anywhere from 80 to 100 miles per hour.  After crashing, the two defendants did not check on the condition of the victims or attempt to render any aid.  Instead, they fled on foot.

The evidence from the preliminary hearing overwhelmingly demonstrates that Gazo and respondent were working together throughout the entire chase.  Their conduct both during the chase and immediately after the crash strongly suggests that they ignored the obvious risks to human life that their actions created.

---

**10**      Respondent asserts that the defendants' conduct in *Glukhoy* created a "high degree of probability" that death would result.  In contrast, he argues that no such showing was made here, and *Glukhoy* is distinguishable.  We need not address these concerns in detail because we reverse this matter based on the extremely low standard necessary to hold a defendant to answer criminal charges.

Respondent argues that his firing at officers were separate acts that were unrelated to Gazo's driving. We disagree. It is apparent from this record that respondent intended to aid Gazo's "reckless and dangerous driving conduct." (*Glukhoy, supra,* 77 Cal.App.5th at p. 601.) We can infer that respondent knew Gazo was driving in a way that was dangerous to human life. From respondent's repeated firing, we can infer that respondent intended to aid and abet Gazo, and respondent intended for Gazo to continue the dangerous driving. Respondent's own behavior amply demonstrates that he acted with a conscious disregard for human life.

At the preliminary hearing phase, the prosecution was only required to show that a "strong suspicion" existed that would cause a person of "ordinary caution or prudence" to believe respondent is guilty. (*People v. Uhlemann, supra,* 9 Cal.3d at p. 667; see also *People v. Slaughter, supra,* 35 Cal.3d at p. 636.) This standard did not require proof beyond a reasonable doubt, or even proof by a preponderance of the evidence. (*People v. Hurtado, supra,* 28 Cal.4th at p. 1189.) The evidence necessary to justify a prosecution is less than what is required to convict. (*People v. Scully, supra,* 11 Cal.5th at p. 582; *Rideout v. Superior Court, supra,* 67 Cal.2d at p. 474.)

The totality of the evidence from the preliminary hearing met the low standard of proof required at this stage of the criminal proceedings. Respondent knowingly and intentionally aided and abetted in the life-endangering act. Respondent acted in conscious disregard for human life. There is some evidence that suggests the driving conduct created a high degree of probability that death would result.

Based on the preliminary evidence, a rational basis exists to assume that respondent is guilty as an aider and abettor to implied malice murder. (See CALCRIM No. 526; *Reyes, supra,* 14 Cal.5th at p. 992; *Glukhoy, supra,* 77 Cal.App.5th at p. 602.) Therefore, these murder charges should not have been dismissed for lack of probable cause. (See *People v. San Nicolas, supra,* 34 Cal.4th at p. 654 [an information will not be set aside if a rational assumption exists that the accused is guilty]; *People v. Superior*

18.

*Court* (*Jurado*)*, supra,* 4 Cal.App.4th at p. 1226 ["[A]n indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged"].)

We do not suggest that the evidence from the preliminary hearing is sufficient to establish beyond a reasonable doubt that Gazo or respondent committed implied malice murder. "On the contrary, it may be difficult for the prosecution to carry its burden of establishing implied malice to the moral certainty necessary for a conviction." (*People v. Watson* (1981) 30 Cal.3d 290, 301.) We merely determine that the preliminary evidence is sufficient to uphold the murder counts in the information, and to permit the prosecution to prove, if it can, those charges. (*Ibid*.)

## DISPOSITION

We reverse the magistrate's order finding a lack of probable cause as to the murders charged against respondent in counts I and II. We vacate the superior court's order granting respondent's 995 motion. We direct the trial court to reinstate these charges against respondent. We remand this matter for further proceedings.


LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


SNAUFFER, J.

19.